## KIRKSEY *vs.* KIRKSEY.

[FINAL SETTLEMENT OF ADMINISTRATOR'S ACCOUNTS.]

1. *Proof of handwriting.*—Where a witness is competent to testify to handwriting, and it is permissible to question him as to the genuineness of a signature, a part of the signature may be concealed from him, and he may be asked in whose handwriting the part shown him is.

2. *Competency of parties as witnesses.*—On the trial of an issue before the probate court, between the administrator and the distributees of an intestate's estate, as to the genuineness of the signature to a note, which purports to have been executed by the intestate, payable to the administrator, and which the administrator claims as a credit on the asserted right of retainer ; a distributee of the estate, being a party to the proceeding, is not competent as a witness against the administrator. The case falls within the exception to the act approved February 14, 1867, (Revised Code, § 2704,) which exception is in these words : "Except that in suits or proceedings by or against executors or administrators, (as to which a different rule is not made by law,) neither party shall be allowed to testify against the other, as to any transaction with, or statement by the testator or intestate, unless called to testify thereto by the opposite party."

3. *Error without injury, in reception of illegal evidence by court.*—On the trial of an issue before the probate court, without the intervention of a jury, the admission of illegal evidence is, at most, error without injury, since the appellate court, in passing on the merits of the case, will consider only the legal evidence.

4. *Comparison of handwriting.*—As to proof of handwriting by comparison the following general rules may be laid down, as the result of the authorities : 1st, that it is not allowable for either witnesses or juries to compare the handwriting of papers not in evidence for other purposes, with the disputed writing or signature, with the view of arriving at a conclusion as to the genuineness of the latter ; 2d, that there is no difference, in this respect, between the competency of an expert and of a person who has never seen the party write ; 3d, that the jury may institute a comparison between the disputed writing or signature and other writings or signatures which are proved to be genuine, and which are in evidence before them for other purposes, in order to arrive at a conclusion as to the genuineness of the former ; and, 4th, that the doctrine as to experts, in such cases, "relates to ancient writings, which are not proved by their antiquity, and to giving their opinion as to the genuineness of a signature or writing, founded on a knowledge of the handwriting of the party by whom it is said to be written ; or, in the case of bank-bills, on a knowledge of the genuineness of bills of a

Kirksey v. Kirksey.

similar character, and some skill and experience possessed by the witness in detecting counterfeits, which are not possessed by the mass of men ; and, perhaps, to an opinion as to whether a signature is genuine or counterfeit, without having an acquaintance with the handwriting in dispute, but not by comparison."

5. *Right of retainer by administrator.*—An administrator has a right to retain assets, in payment of a debt due to him from the intestate ; and is entitled to a credit on final settlement, for the amount of such debt, on such proof as would authorize a recovery on the debt in an action against the intestate, if living.

6. *Trial of issue of non est factum before probate court.*—There is no statute now in existence in this State, which authorizes the probate court to empannel a jury to try an issue of *non est factum,* when it arises on the final settlement of an administrator's accounts.

7. *Review of decision of probate court on contested question of fact.*—In reviewing the decision of the probate court on a controverted question of fact, which was tried before the court without the intervention of a jury, the appellate court will not reverse the judgment, except in cases where, upon established legal principles, the verdict of a jury would be set aside by the court.

· 8. *Burden of proof on trial of issue of non est factum.*—On the trial of an issue before the probate court, between the distributees and the administrator of an intestate's estate, respecting the genuineness of the intestate's signature to a promissory note, payable to the administrator, which the administrator claims as a credit on the doctrine of retainer, the burden of proof is on him, as on the plaintiff in an action at law ; and, as in other civil cases, a mere preponderance of evidence does not necessarily entitle him to a verdict.

APPEAL from the Probate Court of Talladega.

IN the matter of the estate of Isaac Kirksey, deceased, on final settlement of the accounts and vouchers of Albert O. Kirksey, as administrator. The record does not show when the intestate died, nor when letters of administration on his estate were granted to said Albert O. Kirksey. The final settlement was made on the 21st September, 1867. The administrator claimed a credit, as per voucher No. 29 in his account as stated, for the amount of a promissory note for four thousand dollars, which purported to be signed by the intestate, and to have been given for money loaned, was dated the 25th May, 1859, and was payable on the 25th December, 1859, to said Albert O. Kirksey, The widow of the intestate filed written objections to the allowance of this note as a credit to the administrator, on the ground that "said note was not executed by the said Isaac

Kirksey, nor by any one authorized to bind him in the premises;" and she made oath of the truth of the facts stated in her objections. "Issue being made up," as the bill of exceptions states, "on the sworn exception to said voucher No. 29, the following proceedings were had:

"The administrator offered the note in evidence, and, in connection therewith, offered B. F. Burns as a witness, who testified as follows: 'I am not interested in this suit. I was acquainted with the deceased in his life-time, and lived two miles from him, and had frequent transactions with him. I am well acquainted with his handwriting, and believe the signature to the note in controversy to be in his handwriting.' The note in controversy, which was shown to the witness, is hereunto attached as an exhibit. On cross-examination, voucher No. 18, which is also hereunto attached as an exhibit, was shown to the witness; as to which he testified as follows: 'I know it to be in the handwriting of the deceased. There is a difference between the handwriting of the signature to said voucher and the signature to the note; the difference is in the small *k* and *r* in *Kirksey*, but no greater than in the writing of other men at different times. I cannot say positively that the signature to the note is in the handwriting of the deceased; but, if it is not, it is the best counterfeit I ever saw.' On re-examination he said, that there was a difference in the handwriting of the deceased; and two deeds being exhibited to him, which are also hereunto attached as exhibits, he testified, that he saw the deceased sign them, and that the signature to the note was in the same handwriting. Being again cross-examined by the distributees, he said, that there is a difference between the signatures to the deeds and note; that all of them are different; that the difference is in the letter *k* in the word *Kirksey*.

"The administrator having here rested, Wyatt Taylor, senior, was introduced as a witness by the distributees, and testified as follows: 'I was acquainted with the deceased in his life-time, have frequently seen him write, and am well acquainted with his handwriting. The signature to the note is not in his handwriting. There is a difference in the *I* in *Isaac*, and in the *k* in *Kirksey*; and the signa-

ture is in a much finer hand than he ever wrote.' [On cross-examination.) 'I have often seen him write. The signature to the note is nothing like his handwriting.' The witness was here shown the name *Isaac*, in the signature to a paper which purported to be executed by said Isaac Kirksey, while the rest of the signature, and every other part of the paper, except the magistrate's certificate of acknowledgment, was concealed from him ; and was asked, 'In whose handwriting is the word *Isaac*'? The distributees objected to the question, unless the whole name [were] shown to the witness. The court overruled the objection, and the distributees excepted. The witness answered, 'It is in the handwriting of Isaac Kirksey.' Being re-examined by the distributees, he said, that he had taught school for thirty years, and had been a book-keeper, and was well acquainted with different handwritings. The distributees here asked the witness, whether he might not, on a more careful examination, find that the signature to said paper last shown him might. not be in the handwriting of the deceased ; to which question the administrator objected, as leading ; but, before action was taken by the court on the objection, the witness said, that it was not Kirksey's handwriting—that the *I* and *a* were very different from his handwriting. The witness was here shown the signatures to the two deeds which had been shown to the witness Burns, and was asked if they were in the handwriting of said Isaac Kirksey ; to which he answered, that they were in his handwriting, and he supposed that he wrote them. Both deeds were shown to him, and he was asked if there was not a difference between the two signatures ; to which he answered, that there was a difference, but not so great as between the two deeds and the note in controversy; that the letters *I* and *a* were very different; that he was well acquainted with the handwriting of said Isaac Kirksey, and that the signature to the note was not his.

"William Montgomery, another witness for the distributees, testified, that he knew the deceased in his life-time, and was acquainted with his handwriting ; that the signature to the note, in his opinion, was not said Kirksey's ; that neither the *k* nor the *r* was as he usually wrote ; and

that the signature to the note seemed to be in a better hand than he usually wrote. Witness was the successor of said Kirksey as a justice of the peace, and had the books used by him while in the office, and became acquainted with his writing in that way. Being shown the deeds above mentioned, he said, that there was a difference in the letter *I* in *Isaac*, and in the letters *k* and *r* in *Kirksey*. Witness wrote the name Isaac, as to which the witness Taylor was examined. On cross-examination he said, that there was a difference in the letter *I* between the signatures to the deeds and the note; and being shown a paper, which was admitted to be in the handwriting of the deceased, said, ' It is in his handwriting, but I do not think it as good as the signature to the note.' Being re-examined by the distributees, he said : ' I have known the deceased for thirty-one years. He was an old man, over fifty years of age. There is a difference between the signatures to the deeds and the note. The signature to the note is in a better hand than the signatures to the deeds. I would recognize the signatures to the deeds as Kirksey's.

" James Montgomery, another witness for the distributees, testified as follows : ' I have known the deceased since 1835, and often saw him write, some years ago. I was one of the appraisers of his estate. I have been a merchant most of my life, and am acquainted with the handwriting of the deceased. I have examined the note in controversy, and do not believe the signature to be that of the deceased. It is in a smoother and better hand than he wrote. I have never seen any of his writing as good as the signature to the note. He was a laboring man, and a blacksmith by trade.' [Cross-examination.] ' I had no intercourse with the deceased for many years. We were unfriendly. I give my opinion of his handwriting, principally, from examining papers since his death. There is not as much difference between the signatures to the two deeds, as between the signatures to them and the note, though there is a difference between the signatures to the two deeds.' An account, which was admitted to be in the handwriting of the deceased, and which is hereunto attached as an exhibit, was here shown to the witness; as to which he said, that the

signature to it was as good as that to the note; also, that the signature to the note was in a lighter hand than the deceased usually wrote.

"The distributees here offered as witnesses John G. Kirksey, W. H. Kirksey, Mrs. Wensell, and her husband, (the three former being children of the deceased, and distributees of his estate,) and offered to examine them as to the signature to the note in controversy; *to* which the administrator objected, on the ground that they were parties to the suit, and parties in interest, and could not testify about a transaction with the deceased. The court sustained the objection, and the distributees excepted.

"Wyatt Taylor, jr., another witness for the distributees, testified, that he was acquainted with the deceased in his life-time, was acquainted with his handwriting, and lived several years on the same place with him; that the signature to the note was not in the handriting of the deceased; that the signatures to the said two deeds were in his handwriting, and were different from the signature to the note; that the *I* and the *k* were different. On cross-examination he said, that he had often seen the deceased write; that the signature to the note was in a finer hand than those to the *note;* that he (witness) was twenty-three years old, went into the army early in the war, and remained there until its close; and that the deceased was dead when he returned home.

"Andrew Lawson, a witness for the administrator, testified as follows: 'I have never been a book-keeper, and am not expert in detecting the differences in handwriting, having never had my attention specially directed to such differences. I have been the sheriff of the county, and kept the books of my office; and also kept the books of Easley and Terry while they held the office. I have written, probably, one thousand pages on the sheriff's books, and have witnessed the signatures of a good many men. I saw the signature of Isaac Kirksey once during my term of office. It has been a long time since I saw his handwriting, and I do not know that I am acquainted with it.' The distributees objected to this witness as an expert, on the ground that a sufficient predicate had not been laid; which objection the

court overruled, and they excepted. The said note and two deeds were then shown to the witness; as to which he said, that, in his opinion, there was no greater difference between the signatures to the deeds and to the note, than there was among them all; that the signature to the note was in a lighter hand than the signatures to the deeds; that the *k* and *a* were differently formed; that the signature to the note looked like Kirksey's signature to the note he had seen. On cross-examination he said, that the enamel was rubbed off were the signature to the note was written, but more of it was off where the word *Kirksey* was written; that the signatures to the note and deeds were different in appearance; that the signature to the note was in a better handwriting; that he could not say the signature to the note was in the handwriting of the deceased, as it had been a long time since he had noticed his handwriting.

"John C. Walker testified, that he heard a conversation between said Isaac Kirksey and A. O. Kirksey, in 1861, in which the latter offered to buy from the former a negro man, who was then a runaway, and to credit the price on a note which he then held against said Isaac; and that said Isaac replied, that he would not sell the negro, as the balance of his negroes would run away if he did, just to be sold, and that he could pay the note in money without selling the negro. On cross-examination he said, that he heard nothing in regard to the date or amount of the note; that the deceased was a man of means, was very economical, and was in the habit of lending money. Burgess, a witness for the administrator, testified, that he saw the note in controversy, in the possession of A. O. Kirksey, in 1861. On cross-examination he said, that he could not read or write, and only knew the note by the size of the paper on which it was written, and by the endorsement on it; that there was writing on the back of the note, at the top and bottom, but the writing in the middle had been done since he saw the note; that he was living with A. O. Kirksey at the time he saw the note, and walked into the room while he was looking over his papers; that Kirksey showed him the note, and he had it in his hand.

"R. A. McMillan testified, on the part of the administra-

for, that he had been engaged for a long time in merchandizing, and had done a good deal of business in writing for twenty-five years ; that he had some skill in detecting differences in handwriting, but was not skilled when unacquainted with the hand ; that he had seen Isaac Kirksey's handwriting a good many years ago, had seen him write his name, and thought he would recognize his handwriting. The distributees here objected to the examination of said witness as an expert, on the ground that a sufficient predicate had not been laid. The court overruled the objection, and the distributees excepted. The witness was then shown the note, the two deeds above named, and other papers admitted to have been signed by said Kirksey, [and said,] that it had been a long time since he had seen said Kirksey's handwriting, but he believed the signature to the note to be his. On cross-examination he said, that the signature to the note was in a smoother hand than the signatures to the deeds and other papers; that he saw two marks between the letters *k* and *s* in the word *Kirksey*, in the signature to the note, which looked like a stroke of the pen where it had failed to shed ink ; that there was a difference between the signatures in the letter *k*, and also in the smoothness of the handwriting in the word *Isaac ;* and that he did not now believe he had any distinct opinion as to whether the signature to the note was, or was not, in the handwriting of the deceased. On examination in rebuttal he said, that it hardly ever happens that so great a difference exists in the handwriting of the same person, on account of different pens, ink, and paper, and the state of the nervous system, as there is between the signatures to the note and to the other papers shown him.

"This being all the evidence, the court allowed the administrator to retain the amount of voucher No. 29, together with interest thereon ; to which ruling and decree the distributees excepted."

The several rulings of the court to which exceptions were reserved by the distributees, and the final decree allowing the voucher claimed by the administrator, are now assigned as error.

41

BISHOP, WINBOURN & WALDEN, for the appellants.
BRADFORD, MARTIN & ISBELL, *contra.*

BYRD, J.—The first assignment of error raises the question, whether, in a case involving the genuineness of the signature of the maker of a promissory note, which is the foundation of the suit or controversy, a witness may be shown a signature of the maker to another instrument, purporting to have been signed by him, and, concealing a part of the name from the witness, asked, in whose handwriting is the part shown him. The appellants objected to the question being asked, " unless the whole name *shown to* the witness." Without deciding whether such evidence is admissible on the issue made up in this case, as that question is not raised by the exception, we hold, that it only raises the point, whether the witness should have been allowed to testify as to a part of the name of Isaac Kirksey, without seeing it all. The phrase, " unless the whole name [was] *shown to* the witness," serves to point out a specific objection; and the party excepting must be held to that, as the ground of his objection. If it had been admissible to make such proof in this case, we can see no reason why it was not permissible for a party to show the witness a part of the signature, concealing the balance, and ask him in whose handwriting the part shown was. Such a mode of examination may be allowable, to test *the capacity* of the witness to testify to the handwriting of the supposed maker of the instrument, or for other purposes.

2. The second assignment of error raises the question of the competency of the distributees of an estate to testify as to the genuineness of the signature of the intestate to a promissory note payable to his personal representative, and claimed by the latter as a credit on a final settlement of his administration of the estate. The statute under which they claimed the right to testify, so far as it is applicable, is as follows : " That in suits and proceedings before any court or officer in this State, other than criminal cases, there shall be no exclusion of any witness, because he is a party, or interested in the issue tried; except that in suits or proceedings by or against executors or adminis-

trators, (as to which a different rule is not made by the laws of this State,) neither party shall be allowed to testify against the other, as to any transaction with, or statement by the testator or intestate, unless called to testify thereto by the opposite party." This is evidently a *proceeding* by an administrator, before a court of this State; and the " matter in controversy" is the genuineness of a promissory note, *purporting* to have been executed by the intestate. The persons offered as witnesses are distributees of the estate, and a husband of one of the distributees, and are parties to the proceeding. To allow the administrator to testify " as to the signature to the note *in controversy*," would be allowing him to testify "as to a transaction with the intestate," within the meaning of the statute, and he would, therefore, be an incompetent witness under the act, *for that purpose;* and hence, the other parties must be held to be incompetent. The court committed no error in its ruling on this question.—*Stuckey v. Bellah*, at the present term.

3. The third and fourth assignments of error may be disposed of together. It does not appear from the record that the appellee offered the witnesses Lawson and McMillan as *experts*, otherwise than by the objection of the appellants; which objection the court overruled, without assigning any reason therefor. The evidence given by the witnesses was not objected to. If it had been, it would have raised questions upon which the American courts have been much divided. We can see nothing in the evidence of these witnesses,which was admissible only upon the doctrine applicable to *experts*. Part of their evidence was clearly admissible, and other parts were objectionable; and, if they had been experts, would not have relieved that evidence from such objection. In other words, they testified to no fact,which would have been admissible upon the ground *alone* of their expertness. All the evidence being set out, and being addressed to the court, and not to a jury, it was, at most, error without injury; *even* if the witnesses, upon the evidence, were not experts. In passing on the merits of the case, we must look at the evidence as the probate judge should have done; and consequently no injury will

result to appellants from the admission of illegal or irrelevant testimony.

4. The fifth assignment of error raises the last, and the most important question involved in the decision of this cause. In the determination of this question, it is proper, in the condition of this record, to lay down some rules, as to the evidence which should be considered by the court, and the weight to be attached to such as is admissible, under the issue presented. That issue is, whether the signature to voucher 29, upon the evidence, is the genuine signature of Isaac Kirksey.

Much evidence is contained in the record, as to the genuineness of the signature of Isaac Kirksey to other papers, having no connection with the cause; and those papers were introduced as evidence, and are attached to the transcript in this cause, for the inspection of this court; and witnesses were allowed to compare the signature to such papers, with that to the note in controversy, and to give their opinions, upon such comparison, as to the genuineness of the signature to the note. There is, perhaps, no branch of the law, which has given rise to such a contrariety of adjudications in this country, as that which relates to the evidence above referred to. It would be a laborious, if not an useless task, to attempt to review, or to reconcile, the various decisions on this recondite offshoot of American jurisprudence. I shall only notice them so far as we are disposed to follow them.

In the case of *Little, adm'r, v. Beazley,* (2 Ala. 703,) this court said, that "comparison of handwriting, by submitting different writings having no connection with the matter in issue, is not permitted by law. The present case presents the naked question, whether signatures proved to be in the defendant's writing can be given in evidence to the jury, to enable them to determine, by a comparison with the disputed signature, whether the latter is genuine or otherwise. In our opinion, this was not competent evidence."

In *The State v. Givens,* (5 Ala. 754,) Collier, C. J., in delivering the opinion of the court, said : " It is laid down as a general rule, in the law of evidence, that it is not allowable to prove the handwriting of a party, by a mere com-

parison of the disputed paper with a writing admitted or proved to be genuine. A witness, required to testify on the subject, must possess a previous knowledge, acquired by having seen the party write. This rule has been relaxed, where the writings are so ancient that they can not be proved by living witnesses, and yet are not of such antiquity as to prove themselves."

In *Bishop v. The State*, (30 Ala. 41,) this court held, that a genuine signature can not be given in evidence, for the purpose of enabling the jury to compare the handwriting with that of the supposed forged instrument; and recognized the rule, "that papers foreign to the controversy, and having no connection with the case on trial, can not be laid before the jury for any such purpose;" and further, "that when the question of forgery is involved, and other papers bearing the disputed signature are legitimately before the jury, the papers themselves being pertinent to the issue on trial, the jury may institute a comparison." However refined this distinction may be, yet there is abundant authority in support of it.

In *Johnson v. The State*, (35 Ala. 378,) it was held, that a witness who was acquainted with the genuine bills of a banking company, and who had a knowledge of counterfeit bank-bills, could give his opinion of the genuineness of a bank-bill of such company.

Mr. Starkie says : "Evidence by *comparison* of hands is not admissible."—Vol. 2, p. 515. And he puts the rule upon the ground, "that if such comparisons were to be allowed, it would open the door to the admission of a great deal of collateral evidence, which might branch out into a very inconvenient length." He also asserts the doctrine, that the jury may compare "writings in evidence before them for other purposes, and proved to be in the handwriting of the party whose handwriting is disputed, and which are not selected by the party for the purpose of comparison," with the disputed signature. He also says, that the veracity of a witness, speaking to the handwriting of the defendant, can not be tested by putting into his hand another paper, purporting to be the writing of the defendant, and asking the witness whether it is in the handwriting of the defend-

ent or not.—*Ib.* 518. To the same effect, see Phillipps on Evidence, vol. 2, p. 609; also, note 4, on pages 603–08, where the decisions of the courts of many of the States are collated.

Upon the subject of comparison of handwritings, Mr. Greenleaf says, upon an examination in chief, "the modern English decisions are clearly opposed to it." And two reasons, he says, have been assigned for the rejection of such evidence—1st, the danger of fraud in the selection of the writings offered as specimens; and, 2d, the multiplication of collateral issues, and the subversion of justice; and he then proceeds to say : "to which may be added the danger of surprise upon the other party, who may not know what documents are to be produced, and, therefore, not be prepared to meet the inferences drawn from them. The same mischief would follow, if the same writings were introduced to the jury through the medium of *experts.*"—1 Greenl. Ev. § 580. But *experts* have been allowed to testify whether a writing is a real or a feigned hand, and may compare it with other writings already in evidence in the cause.—*Renet v. Braham,* 4 T. R. 497; *Moody v. Rowell,* 17 Pick. 490; *Lyon v. Lyman,* 9 Conn. 55.

In the case of *The King v. Cator,* (4 Esp. 117,) which was a prosecution for libel, evidence was admitted "to establish the fact of the libellous letters being of the defendant's handwriting. The counsel for the prosecution produced several letters, avowedly written by the defendant; in fact, written to the prosecutor, in answer to letters written by the prosecutor to him; and proved the fact, clearly, that the letters were in the handwriting of the defendant; and then it was proposed to call a clerk, who held the place of inspector of franks in the postoffice, to prove that the hand in which the libels were written was a feigned one; and to prove that, notwithstanding the disguise, the hand in which the libels were written, was the same with that of those letters admitted to be the defendant's handwriting in the letters above stated."

After a full and most thorough argument, it was held by the court, that the evidence of the witness proving "the hand in which the libels were written was a feigned one,"

was admissible. And it is apparent from the case, and the opinion of the court, that it was held admissible on the ground, that the witness was an *expert*. But the court held, that the evidence of the same witness, to the effect that "the hand in which the libels were written, was the same with that of those letters admitted to be the defendant's handwriting," was inadmissible. The court uses this language: " It is said to him (the witness), 'Now look at this paper, and tell me, if the same hand wrote both.' Why, one can not help seeing, evidently, what must be the consequence. I can not conceive there is anything in the idea of a comparison of hands, if this is not to be considered as comparison of hands. The witness says, 'I never saw him write in my life.' Why, then, I collect all my knowledge of his being the author of this, by comparing the same hand with that which other witnesses have proved to be a natural hand; by looking at the two, he draws his conclusion. It seems to me, therefore, directly and completely a comparison of hands." This case is in full accord with the text of Mr. Greenleaf, above quoted. It was also held, that there is no distinction, as to its admissibility as evidence, between a criminal and civil case.

The following cases will show the doctrine which has been held on these questions: *Guerney et al. v. Langlands*, 5 Barn. & Ald. 330 ; *Moody v. Rowell, supra; Bank of Penn. v. Huldeman*, 1 Penn. 161; *Moye v. Herndon*, 30 Miss. (1 George,) 110. See, also, cases referred to in 1 Greenl. Ev. p. 726, §§ 580–81, and notes 2 and 3.

From the authorities reviewed, the following general rules may be laid down : 1. That it is not allowable for witnesses, or juries, to compare the handwriting of papers not in evidence *for other purposes*, with the disputed writing or signature in evidence, with the object of arriving at a conclusion as to the genuineness of the latter. 2. That, in this respect, there is no distinction between the competency of a witness who has seen the party write, and an *expert* who has never seen him write. 3. That the jury may institute a comparison between writings or signatures in evidence before them for other purposes, proved to be genuine, and the disputed one, in order to arrive at a conclusion as to

the genuineness of the latter.   4. That the doctrine as to *experts*, as applicable to signatures or writings, relates to ancient writings, which are not proved by their antiquity; and to giving their opinion as to the genuineness of a signature or writing, or its being a counterfeit, founded on a knowledge of the handwriting of the party by whom it is said to be written ; or, in the case of bank-bills, on a knowledge of the genuineness of bills of the character in dispute, and some skill and experience that the witness may possess in detecting counterfeits, not possessed by the mass of men ; and, perhaps, to an opinion as to whether a signature is genuine or counterfeit, without having any acquaintance with the hand in dispute, but not by comparison.—*Johnson v. The State*, 35 Ala. *supra; Fulton v. Hood et al.*, 34 Penn. St..R. 365 ; and authorities above cited.

5. Applying these rules, as far as applicable, to the evidence set out in the record, we will proceed to determine whether the court below correctly allowed the credit to the administrator of the note in controversy.   The administrator is entitled to retain assets, in payment of a debt due him from his intestate, or to a credit for the amount of such debt, on a settlement of his administration.—*Parker's Heirs v. Parker's Adm'r*, 33 Ala. 459 ; *Kinnebrew's Distributees v. Kinnebrew's Adm'rs*, 35 Ala. 628.   And he is entitled to such credit, upon proof that would authorize a recovery in an action on the debt against the intestate, if he were alive. *Gaunt and Wife v. Tucker's Ex'rs*, 18 Ala. 27.

6. In this case, the plea of *non est factum* was interposed by one of the distributees ; and although such an issue, where the evidence is so conflicting as in this case, is one which should be tried by a jury, yet there is no statute, now in existence, which would authorize the court below to empannel a jury to try the same, as was done in the cases of *Willis v. Willis*, 9 Ala. 330, and *Reynolds v. Reynolds*, 11 Ala. Rep. 1022.

7. We must, therefore, pass upon the law and the facts, as an appellate court is often required to do, in probate and equity court causes, and as those courts are authorized by law to do.   But we have not the advantages, in forming a judgment upon the testimony, which the probate court

had; for the witnesses are usually examined *ore tenus*, in the presence of the court, and it can apply the same tests to their testimony which a jury is authorized by law to do. They can look to the demeanor of a witness on the stand, and perceive whether he has any inclination or bias in favor of either party; observe and judge of his powers of discernment, memory, and description, and determine therefrom the just weight and value of his testimony. In making up a conclusion upon written testimony, the court and jury are both deprived of the benefit of these tests, to the extent afforded by an examination of the witnesses in the presence of the court and jury. In a case where the testimony is conflicting, or variant, as in this case, these tests are of great importance; and the judgment of a court, or the verdict of a jury, rendered in such a case, should not be disturbed, except on the clearest conviction of an erroneous decision. In other words, the judgment of the court below should not be set aside, unless a court would be authorized, upon established principles, to set aside the verdict of a jury, where the issue had been tried by them.

Keeping in view the rules and principles hereinbefore sanctioned, we will proceed to the consideration of the testimony, and make an application of the law to it, in order to arrive at a correct judgment upon the merits of this cause. The appellee introduced and examined five witnesses, and the appellants four; and the original note, the subject of controversy, attached to the transcript by the judge of probate under the 18th rule, (Revised Code, p. 817,) " will be considered by this court in connection with the transcript of the proceedings."

8. In a trial of an issue, on a plea of *non est factum*, as it is called, the burden of proof is on the plaintiff (Code, § 2279); and in this case, the appellee occupies the position of the plaintiff in a suit in a court of common law. A mere preponderance of evidence does not necessarily entitle a party to a verdict, upon whom is cast the burden of proof.—27 Ala. 272; *Jarrett v. Lillie*, 39 Ala. 400. The jury should be satisfied, after considering all the evidence before them, and the law given to them by the court as applicable thereto, that the party upon whom the burden of

proof lies, is entitled to a verdict on the issue submitted to them. And in this case, the court should be governed by the same rule.

Three of the witnesses of appellee testify as to the question of the handwriting of the deceased. Neither of them speaks positively as to his opinion of the genuineness of the signature to the note. The first says, on examination in chief, that he is well acquainted with the handwriting of deceased, and *believes* the signature to be the handwriting of deceased; and on cross-examination says, that he can not say positively that the signature is the handwriting of deceased, "but if not, it is the best counterfeit he ever saw." He does not testify how many counterfeits he had ever seen, or that he had any skill in detecting them. The second witness says, that he had seen the signature of deceased once, and had not seen his handwriting for a long time since, and did not know that he was acquainted with the handwriting of the deceased; but that the signature to the note looked like the signature to the note witness had seen; and on cross-examination, that he could not say the signature to the note was in the handwriting of the deceased, as it had been a long time since he had noticed the handwriting of deceased. The last witness testified, that he had seen the deceased sign his name several years ago; and after saying that he believed the signature to be the nhadwriting of deceased, said on cross-examination, that he " does not now believe he has any distinct opinion, as to whether the signature to the note is in the handwriting of deceased or not." Two witnesses prove circumstances showing, or tending to show, that the appellee had a note against the decedent in 1861. But their evidence fails to identify this note as the one, to our satisfaction. One describes a note, with an edorsement at the bottom of the back; and though this has such an one, yet it was made in 1866, at the same time the one near the middle of the back was made; and the witness could neither read nor write, and only saw it once casually in 1861; but remembers the endorsement at the bottom and top of the back of the note. This may have been a very honest mistake; but it shows that his memory of things he saw five or six years ago is not alto-

gether reliable. Nor does the evidence of the other iden-
tify this as the note which was spoken of in 1861 by the
parties.

On the other hand, the four witnesses introduced by ap-
pellants show that they were more familiar with the dece-
dent's handwriting than the witnesses of the appellee, ex-
cepting the witness Burns; and two of them are very pos-
itive, that the signature is not in the handwriting of the
deceased; and the other two give their belief very clearly
to the same effect; and all assign reasons or grounds for
their conclusions.

We are satisfied that, upon the evidence, testing it by
legal rules applicable to such a contrariety or conflict of
opinion and circumstances, that the appellee did not make
good the affirmative of the issue. Besides all this, there
are circumstances which might be looked to as confirma-
tory of the conclusion to which we have come; such as—
1st, the absence of any evidence to prove any transactions
between the parties, which would establish the considera-
tion of the note; 2d, that the note was not seen by any
other person from 1859, until it was filed in court, in 1866,
except by the witness who saw a note in 1861, like the one
in controversy, in the possession of appellee. These are
circumstances, slight in themselves, against the authenticity
of the note; but the consideration, if proven, would be ma-
terial to the issue, in a case where the evidence is so con-
flicting as in this case; and it may, perhaps, be proved on
another trial.

We have laid down rules and principles in this opinion,
which go beyond the necessities of a decision of the case
upon the present record; but only such as the evidence
indicates may aid the court below, on another trial, in
making up a decision upon the admissibility of evidence
and the merits of the cause.

The clerk of this court will deliver to the respective par-
ties, or their attorneys, the original exhibits attached to
the transcript, respectively introduced by them; taking a
copy of the note, with the endorsements thereon, and at-
taching it in the place of the original.

The decree is reversed, and the cause remanded.