# *Ex parte* Buckley.
# *Ex parte* Murphy.
# *Ex parte* Robinson.
# *Ex parte* Wolffe.

*Application for Certiorari, &c.*

1. *Certiorari.*—Certiorari from the supreme court is the only remedy to revise the action of the circuit judge or chancellor, in requiring a new bond from a county official, under the provisions of the "act to secure good and sufficient sureties. upon the bonds of county officials of this State," approved March 17th, 1875.

2. *Same.*—Practice as to grant of writ of *certiorari*, in the absence of statutory regulations, stated.

[*Ex parte* Buckley.]

3. *Official bonds; power of general assembly to require.*—The general assembly, as to officers charged with ministerial duties, and those judicial officers upon whom it is competent to impose them, has plenary power, not only to determine when, and by whom official bonds shall be executed, and the sufficiency of the surety, and the extent of the obligation, but also to change the existing law, from time to time, as in its discretion the public good requires, and to exact new and additional bonds, variant in condition, penalty, obligation and surety from those executed under the existing law, and under which the officer was inducted into and holds office.

4. *Retrospective statutes; how construed.*—Retrospective statutes, when within legislative competency, are not favored, and it is a sound rule of judicial construction, that they shall operate prospectively only, unless their terms show a clear legislative intent that they shall operate retrospectively.

5. *Same.*—Statutes which may be properly denominated retrospective, and subjected to this strict rule of construction, are such as take away or impair vested rights, acquired under existing laws, or create a new obligation or impose a new disability in respect to transactions already past.

6. *Same; when liberally construed.*—Statutes which are intended to remedy a mischief, promote public justice, correct innocent mistakes into which parties have fallen, cure irregularities, or give effect to the acts and contracts of individuals fairly made and done, although having a retroactive effect, are not subjected to the judicial condemnation visited upon retrospective statutes in general, and are to be construed liberally to advance the beneficent purposes for which they were enacted.

7. *Act to secure good and sufficient sureties on the bonds of county officials; constitutionality and construction of.* The "act to secure good and sufficient sureties on the bonds of county officials, "&c.," is strictly remedial in its nature, and promotive of public justice and individual right.

8. *Same; title of, not delusive.*—The title of the act is not delusive, and clearly expresses the one subject to which the provisions of the act relate.

9. *Same; application of, to officers qualified under laws existing prior to its passage.*—Its application to officers who had executed official bonds under the law existing prior to its passage, impairs no vested rights, creates no new obligations, imposes no new duties, and attaches no new disability in respect to a past transaction, or arising out of a past consideration.

10. *Same; proceedings under.*—Proceedings under the statute are summary, and strict conformity to its provisions, in the exercise of the jurisdiction conferred, is essential to the regularity and validity of the proceedings; but it is an incident of the jurisdiction to allow amendments necessary to conform the proceedings to the statute, and to continue the hearing, as right and justice may require.

11. *Surety; when insufficient.*—When the surety is habitually absent from the State during much of each year, and the facts as to his residence leave his domicil in doubt, he may be properly declared an insufficient surety.

This is an application by Charles W. Buckley to this court, for a writ of *certiorari, supersedeas*, or other appropriate writ, to review certain proceedings, had before the Chancellor of the Southern division (Hon. H. Austill) under the provisions of "an act to secure good and sufficient sureties on the bonds of the county officers of this State," whereby Buckley's bond, as probate judge of Montgomery county, was declared insufficent, and a new official bond required of him.

Similar applications were made by John N. Murphy, sheriff, Patrick Robinson, tax collector, and Frederick

[*Ex parte* Buckley.]

Wolffe, treasurer of Montgomery county, each of whose official bonds had been declared insufficient, on proceedings under the statute, and an order made requiring them respectively to execute new official bonds.

Each of these officers annexed to and made part of their respective petitions a full transcript of the proceedings before the chancellor, the counsel for the opposite parties appeared and waived notice, and the causes were argued and submitted together. Buckley's case is alone reported, as it presented all the questions involved in the other cases, besides one or two points not raised in them.

On the 13th day of May, 1875, J. A. Booth, G. P. Keyes, and ten other freeholders of the county of Montgomery, filed in the office of the register in chancery, at Montgomery, a petition addressed to the chancellor of the Southern Chancery Division, alleging that the official bond of Charles W. Buckley, as probate judge of Montgomery county, was insufficient, and praying the chancellor to declare it insufficient and invalid, and to require said Buckley to execute a new official bond.

The application alleged in substance that petitioners were resident freeholders of the county ; that Buckley was judge of the probate court of said county, and had executed an official bond as such, in the penal sum of fifteen thousand dollars, which was duly taken and approved, on the 13th day of November 1874 ; that the sureties on said bond were Jos. W. Dimmick, W. T. Hatchett and J. P. Stow; that the bond was invalid and insufficient because Jos. W. Dimmick is a bonded officer of the United States, being clerk of the district court of the middle district of Alabama ; that said J. P. Stow did not reside in the county, and was a resident of the town of Meriden, in the State of Connecticut, that said Hatchett was under bond in the sum of fifty thousand dollars, as county administrator of Montgomery county, and that his real and personal property, situate in Montgomery county, over and above leabilities and exemptions, did not exceed one hundred dollars. The petitioners originally prayed that the bond of Buckley, as *ex officio* judge of the county court be declared insufficient, but as relief to it was afterward abandoned by them, it is unnecessary to refer further to it. A copy of Buckley's official bond, as probate judge, was made a part of the petition, and the petition further stated that the application was not made for the purpose of vexing or harrassing the said Buckley. The petition was verified by the affidavit of one of the petitioners to the truth of the statements therein contained, and that the applica-

tion was not made for the purpose of vexing or harrassing Buckley.

The chancellor, before setting a day for the hearing, required the petitioners to enter into bond in the sum of one thousand dollars, with sureties, payable to the said Buckley, conditioned to prosecute the application to effect, and to pay said Buckley all such damages as he might sustain by the wrongful or vexatious making of the application, together with costs. Such bond having been made, and approved by the chancellor, he made an order on the 22d day of May, 1875, fixing the hearing of the application for the first day of June next.

Notice was issued to Buckley, reciting in substance that an application had been made to the chancellor, by five or more resident freeholders of the county, requiring him (Buckley) to give a new bond as probate judge, "because petitioners alleged that his present bond was invalid and insufficient, and that the 1st day of June, 1875, had been set for the hearing of the application, a copy of which could be procured by calling on the register of the chancery court."

On that day Buckley appeared, specially, for the purpose of objecting to the notice and service. The grounds of objection to the service were, that it was not made by the sheriff, or any other officer, but by a mere private person.

The notice was objected to because it did not declare the names of the petitioners or of the sureties upon the official bond, or in what the invalidity or insufficiency of the official bond consisted, and was not accompanied by any copy of the petition. "The chancellor sustained the objections, and ruled that sufficient notice had not been given to authorize him to proceed to a hearing on the merits. The petitioners thereupon moved for an order for the issue of an *alias* notice, and the fixing of another day for the hearing of the petition. Buckley moved the chancellor to dismiss the petition and to adjudge the proceeding to be at an end, on the ground that the proceeding was strictly statutory, and the power of the chancellor to fix another day for the hearing, after a day had already been appointed, was exhausted; that on account of the insufficiency of the notice the proceeding was discontinued."

The chancellor overruled this motion, and fixed the 17th day of June, 1875, for the hearing of the petition, continued the matter until that day, and ordered an *alias* notice to issue to Buckley; to all of which he duly excepted."

On the 17th of June, 1875, Buckley again appeared specially for the purpose of objecting to the notice served upon him,

because the notice and exhibits thereto, including a copy of the petition served upon him, did not contain a verification of the application, nor any copy of the bond referred to, and moved to set aside said service; but the chancellor overruled the objection and required him to answer, and he excepted.

Buckley thereupon moved to quash the application and proceedings in the cause: 1st. Because it appears that the bond mentioned in the proceeding was executed and approved long before the passage of any law authorizing this proceeding.

2nd. Because the act under which this proceeding is instituted has no retrospective or retroactive operation, even if valid; and said act is unconstitutional.

3rd. Because said act is unconstitutional and void; the title is delusive and does not fairly express the subject set forth in the act; the Legislature in its passage, exercised judicial power; the 1st, 2d and 3d sections are not germane to the title and are void; it undertakes to remove a judicial officer, duly elected, qualified, and inducted into office in a manner different from that provided by the Constitution."

The court overruled the motion to quash, and Buckley duly excepted.

Buckley, thereupon, demurred to the petition on substantially the same grounds as those urged in support of the motion to quash, but the chancellor overruled the demurrer, and Buckley excepted. He then answered, showing his election, qualification and induction into office, and the execution of the official bond as alleged in the petition. This bond was in proper form, penalty and condition, and was sufficient and valid in all respects, under the law, as it stood before the passage of the act under which this proceeding was instituted. He denied the remaining allegations of the petition.

On the hearing, it was shown that the petitioners were all resident freeholders of the county. Dimmick was, and had been, clerk of the circuit and district court of the United States for the middle district of Alabama, since September, 1874, giving bond as such, for ten thousand dollars. He owned about eight thousand dollars' worth of property, above liabilities and exemptions, not counting his bond as a liability. It was shown that Hatchett was general administrator of the county, having given bond as such in the penalty of fifty thousand dollars. His property, situate in the county, was assessed the year before, for taxation, at the sum of $3,120, and in the year 1875 no real property and only one hundred and twenty dollars' worth of personalty was assessed against him.

*[Ex parte Buckley.]*

In 1874, Stow's real property, situate in the county, was assessed at $14,000, and the evidence was conflicting as to the present value of his property in the county. Some of the witnesses testified that it was worth as little as $15,000, and others as high as $30,000. Stow was surety upon the official bond of Aiken Finley, as disbursing officer of the United States land office, for the sum of five thousand dollars. Evidence was introduced tending to show that said Stow was also surety upon the bond of one Widmer, as United States Revenue Collector, for the sum of ten thousand dollars. Neither of these bonds were produced. Finley's bond was shown to be on file in Washington, and no effort was shown to obtain it or or a copy, but Finley himself testified that Stow signed it as his surety. Objection was made to this and other evidence; but in the view which this court took of the case, it is unnecessary to refer further to it.

Several weeks before the hearing Stow ceased to do business in Montgomery, and offered his property here for sale. His wife had a summer residence at Meriden, Connecticut, where he generally spent the summers. Before Stow left he remarked that he saw no future for Alabama, on account of high taxes, and on being asked to register for an election about to be held, replied that he would, but that he did not expect to be in Alabama. One witness testified that just before leaving, Stow told him he was trying to wind up his business here and intended going to his home in Meriden, Connecticut. Other witnesses testified that Stow had been in the habit of spending his summers North and his winters at the South, for several years, and that he told him when he left that he would be back in the winter. Stow had the remnants of a stock of hardware still on hand in Montgomery, and had some unfinished business here. He stated in a letter, dated May 25th, 1875, which was introduced in evidence, "that he had never voted in any other State, and voted in Alabama last fall."

The chancellor adjudged the bond insufficient, and made an order requiring Buckley to execute a new official bond, as probate judge, within fifteen days, &c.

RICE, JONES & WILEY, H. C. SEMPLE, and R. M. WILLIAMSON, for petitioners.

STONE & CLOPTON and D. S. TROY, *contra.*

BRICKELL, C. J.—The general assembly, at its last session, passed an act, approved March 17, 1875, entitled,

"an act to secure good and sufficient sureties upon the bonds of the county officers of this State." Pamph. Acts, 1874-5, p. 50. The first section declares the sureties on the bonds of the judge of probate, judge of the county court, sheriff, clerk of the circuit court and city court, tax collector, tax assessor, and county treasurer, of the several counties in this State, must reside in the counties in which the duties of such officers are to be performed. The second section declares that no State, county, or municipal officer, or officer of the United States, excepting justices of the peace, notaries public, constables and postmasters, shall be sufficient surety on the bond of a county officer. The third section requires that the sureties of the bonds of the officers named in the first section, must own property real and personal, over and above their liabilities, and the exemptions allowed by law, equal in amount to the penalty of such bond, which must be situated in the county of the officer's residence. The fourth section declares the bond a lien on the property of the officer from the date of the execution thereof. The fifth section provides the bonds of the several officers mentioned must be approved by the judge of probate of the county, except the bonds of the judge himself, which must be approved by the judge of the circuit or chancellor of the division in which the judge resides. The sixth section authorizes five or more resident freeholders of the county within which any one of the county officers discharges the duties of his office, to apply to the chancellor of the division, or judge of the circuit court of the circuit, by application verified by oath, alleging the insufficiency or invalidity of the bond of any of these officers, for any cause, and stating the cause, to require such officer to make a new bond. The seventh section requires the chancellor or judge, on the application being made, to appoint a day, not more than twenty days thereafter, for the hearing of said application, of the time and place of which at least ten days notice must be given to the officer. If on the hearing the bond appears to be invalid and insufficient, an order must be made requiring the officer to make and execute a new bond within fifteen days. The eighth section requires the application and proceedings thereon, to be filed in the office of the clerk of the circuit court of the county, unless the complaint is of the insufficiency of his bond, when they must be filed in the office of the probate judge. The ninth section requires, if the new bond is not executed, the officer with whom the proceedings are filed, must certify the failure to the appointing power, and the vacancy must be filled as in other cases. The tenth section requires one or

more of the applicants to make oath that the application is not made for the purpose of vexing or harrassing the officer, of whose bond complaint is made, and to execute with sufficient sureties, a bond, in a penalty to be prescribed by the chancellor or judge, payable to the officer, with condition to prosecute the application to effect, and to pay all costs and damages, he may sustain from the wrongful or vexatious making of the application.

Under this statute complaints were made to the chancellor of the southern division, of the insufficiency of the bonds of Charles W. Buckley, judge of probate; John N. Murphy, sheriff; Patrick Robinson, tax collector; and Frederick Wolffe, county treasurer, of the county of Montgomery. A separate application was made as to each officer, and was separately heard and determined by the chancellor. The bond of each was declared insufficient, and each was required to execute a new bond. Each of these officers have applied to this court for a *certiorari*, or other appropriate writ, to review the proceedings had before the chancellor. The applications present similar questions, and were argued and submitted together, and so we will consider and pass upon them.

The power, the jurisdiction, conferred by this statute on the chancellor, or judge of the circuit court, does not lie within the general power or jurisdiction, inherent in the court of chancery, or the circuit court, or in the office of judge or chancellor. The statute creates the power and jurisdiction, and prescribes the mode of its exercise, variant from the mode in which the original jurisdiction of the chancellor, or judge, can be exercised. No method of revising the proceedings had, in the exercise of this jurisdiction, is given by the statute creating it. It is a general rule of the common law, that when a new jurisdiction is created by statute, and the court or officer exercising it proceeds in a summary mode, or in a course different from the common law, and a remedy for the revision of its exercise, is not given by the statute creating it, a *certiorari*, from the court having a general superintendence and control over inferior jurisdictions, will lie for its revision. 1 Brick. Dig. 333, § 2. The constitution expressly confers on this court, the power to issue such remedial and original writs, as may be necessary to give it a general superintendence and control of inferior jurisdictions. No other court than this is superior in jurisdiction and authority to, and capable of exercising a superintendence and control over the chancellor, or judge of the circuit court. The corrective power of revis-

4

ing, reversing or modifying, the proceedings under this statute must reside here, or they would be free from correction, however erroneous. A party complaining of error in the exercise of this statutory jurisdiction, is therefore entitled to a *certiorari* from this court. In the absence of statutory provisions, the writ is granted only on petition, after notice to the adverse party, and it must clearly appear, that substantial injustice has been done. If probable cause for supposing that injustice has been done, is not shown, granting the writ would answer nᵣ useful purpose, and would tend only to unnecessary delay, and useless expense, in the administration of justice. In these cases, the adverse parties have appeared, and the applications being accompanied with full transcripts of the proceedings befcre the chancellor, the argument was directed to the various matters which we suppose would be assigned as error, if the writ had been issued, and a due return made to it. On these matteis, an adjudication, as final and conclusive, may now be pronounced, as if the parties had pursued a more formal course of practice. Notice of the application is necessary, that the parties adverse in interest may have the opportunity of being heard, and no principle by which an inferior tribunal is to regulate its action in determining their controversaries, shall be announced, until they have been heard. Their appearance is a waiver of, and dispenses with notice, and the applicant may, as these applicants have, in discharging the *onus* of showing injustice in the proceedings of the inferior tribunal, point out the errors on which they rely, to quash or reverse its action.

It is insisted for the petitioners, that the statute under which the proceedings were had, cannot be applied to officers, elected or appointed, and inducted into office, having executed official bonds, properly approved, and sufficient in surety under the law as it existed prior to the passage of the statute. If so applied, it is urged the statute operates retrospectively—that its terms do not clearly import a legislative intent, that it should have any other than a prospective operation, and not so importing, it must be limited to official bonds, which may be taken in the future.

The requisition of official bonds, from officers charged with ministerial duties, is wholly of statutory creation. The constitution does not either expressly or impliedly, impose the execution of such bonds, as a condition precedent to entering into, or a continuance in office. From every ministerial officer, charged with duties to the State, or to individuals, which if not faithfully performed, involve pecuniary loss, as a direct and immediate consequence, it has been the

legislative policy to exact bonds with sufficient sureties, which will protect and indemnify the State, and the citizen against official delinquency. Judicial officers, on whom it is competent for the legislature to devolve ministerial duties, as judges of the former orphans' court, the present judges of probate, who have succeeded to the authority and duty imposed on them, and justices of the peace, have always been required to execute official bonds. Such bonds refer to, and are a security only for the performance of ministerial duty, when exacted from these officers. *McGrew* v. *Governor*, 19 Ala. 89; *Lester* v. *Governor*, 12 Ala. 626; *Hamilton* v. *Williams*, 26 Ala. 52; *Thompson* v. *Holt*, 52 Ala. 491. In the absence of a statute enlarging the obligation, the sureties on official bonds of officers exclusively ministerial, are not liable for a malfeasance committed under color of office, unless it includes a misfeasance. *Governor* v. *Hancock*, 2 Ala. 728; *McElhaney* v. *Gilleland*, 30 Ala. 183.

It lies within the legislative power to determine the officers charged with ministerial duties from whom official bonds shall be required, the penalty, condition and obligation of such bonds, and the qualification of the sureties who are to join in their execution. Before such bonds can have validity, or a legal consideration which will support them as contracts, the legislature must have required their execution, as a condition precedent to entering upon, or continuing in the discharge of official duty, or as a duty the officer is required to perform. *State* v. *Bartlett*, 30 Miss. 624.

Without statutory provision, it would be voluntary and gratuitous. At common law such a bond would be void. No bond or writing could be exacted from the subject, to the King or other person, to do that, which by law, he was bound to do to the King, and such bond, was void on the plea of *duress*, "and such bond is to the dishonor of the King, for every subject ought to do the King his sovereign all service due without compulsion." The unwarrantable exaction of such bonds, was an offense punishable by fine. 5 Com. Dig. 219. Of course we refer to bonds strictly official, and not to a particular security, which public officers may give to an individual, whose interests are intrusted to his hands, for the faithful performance of his duties in respect to him. Such an obligation may be enforced, not as an official bond, but as a contract made on sufficient consideration, between parties capable of contracting. *Todd* v. *Cowell*, 14 Ill. 72; *Whitsett* v. *Womack*, 8 Ala. 466. A bond, however, with a general condition for the faithful performance of official duty, operating alike as a security to the State, and to

[*Ex parte* Buckley.]

'each individual sustaining injury from official delinquency, must be authorized by statute, or it could never be exacted, and if voluntarily given would be without consideration. There would be no obligee, and it would be incapable of delivery.

The requisition of such bonds, lying exclusively within the legislative power of the state, the general assembly has an unlimited discretion to determine not only when and by whom such bonds shall be executed, the sufficiency of the security, and the extent of obligation, but to alter or change existing laws prescribing these, as the public good may demand. They may not have the power to deprive individuals of causes of action, which may have accrued to them, because of the breach of such bonds. But they have plenary power to exact from the public officer, a new or additional bond, it is not material what designation may be given it, variant in penalty, condition, obligation, and surety from that which he may have executed, as public interests demands.

In the case of *Governor* v. *Hancock, supra,* complaint was made of a gross abuse of office by a sheriff, a malfeasance, for which he was individually liable; but not including official misfeasance, the obligation of his official bond, did not impose on his sureties liability for it. It cannot be doubted that it was competent for the legislature, when it was developed by judicial decision, that the condition and obligation of the bond, was not sufficient for the protection of the citizen, against wrong which could be committed *colore officii,* to enlarge the condition and obligation of such bonds so that ample indemnity would be afforded. Nor does it seem to be a matter of doubt, that a new or additional bond, conforming to the change in condition and obligation, could be compelled from the public officer, in office, under a bond sufficient in all respects, according to existing laws, as well as the officer subsequently entering into office. If such bond could not be demanded, the power of the legislature would not be adequate to the correction and prevention of the mischief. The wrong could as well arise from the malfeasance of the officer in office, as from that of one subsequently entering into office.

The law, prior to the statute under consideration, simply demanded "sufficient sureties" on the bonds of public officers. On the officer, authorized to take and approve an official bond, was devolved the discretion and duty of judging of, and determining who were sufficient sureties. Residence in the county or State, ownership and possession of visible

and tangible property, subject to seizure on legal process, the amount of contingent liabilities resting on him, which if they ripen into absolute liabilities, would be entitled to priority of payment over the bond into which he was entering, was not a positive disqualification of a surety. If experience satisfies the general assembly, that there has been abuses, or carelessness in the exercise of the large discretion entrusted to officers approving official bonds, in the taking of sufficient sureties; or, that the public good demanded that sureties should possess particular qualifications, or should not labor under particular liabilities, there is no room to doubt, that they have ample power to remedy whatever of evil is to be apprehended. The power would not be ample, if it could be exercised only in reference to officers subsequently executing official bonds.

There is manifest reason, in a legislative command to an officer taking and approving an official bond, to require and accept only sureties resident, and having property situate in the county in which a public officer discharges his official duties. The grand juries who are required to report on the sufficiency of the bond, and who may, and usually do act, only on the knowledge its individual members may have as to the character and sufficiency of such sureties, will have better opportunities of forming a correct opinion on which they can found a report. To them is entrusted the duty of inquiring into, and reporting upon the sufficiency of such sureties, because they are drawn from different parts of the county, supposed to be identified by residence and interest with it, and to have full opportunities from their knowledge of their fellow-citizens, the property they possess, their freedom from, or subjection to pecuniary obligations, of determining who are good and sufficient sureties. The same may be said of the commissioners' court of the county, any three of whom may on address in vacation, demand the execution of an additional official bond, from county officers. When it is considered that the statutes had for more than twenty years subjected the bonds of county officers to the scrutiny of the grand jury, and of the commissioners court, confined in authority to the body of the county, and committed to them the power of demanding additional bonds, when they believed the interests of the county or citizen required it, and this power is committed to them because of the knowledge it is supposed they possess in reference to the citizens of the county, it is not too much to say, that without statutory injunction, an officer required to approve the bond of a county officer, without an abuse or oppressive exercise of his

discretion, could refuse to accept as surety, any other than a resident citizen of the county, having visible, tangible property within the county, subject to compulsory process for the satisfaction of the liability the bond imposes, if it should become fixed. With equal propriety it may be said, that it would not be an unwise, or unjust exercise of the discretion resting upon him, to reject as surety one subject to a liability, absolute or contingent to the United States, not insignificant in amount. Embarrassing questions might arise, if such liabilities became fixed, and the bankruptcy or insolvency of the surety occurred. For such liabilities, the United States would be entitled to a priority of payment, and the claims of the State, or county, or citizen, would be involved in conflict with this priority, and subordinated to it. The uncertainty attending the contingent liability of the principal or surety, in an official bond, whether it is payable to the State, or the United States, could well be considered by the officer, even if his discretion is unlimited, in receiving or rejecting sureties.

A fair and candid examination of the provisions of the statute under consideration frees it from the imputation of harshness and severity, which counsel for the petitioners attribute to it. No surety can under its operation be rejected as insufficient, who could not have been properly rejected by the officer taking and approving an official bond, without the just imputation that he was harsh and exacting in the exercise of his discretion. If experience proved, and the public good demanded, of which the general assembly alone can judge, that only persons possessing the qualifications prescribed, or laboring under the disabilities declared, are, or are not, "good and sufficient sureties upon the bonds of the county officers of the State," it was a duty to enact this statute. The protection and indemnity of the State, the county, and the citizen required it.

Nor in its application to officers, who are in office, under bonds not conforming to its provisions, can it be deemed retrospective. Retrospective statutes, when with in legislative competency, are not favored, and it is a sound rule of judicial construction, that they shall operate prospectively only, unless the terms show a clear legislative intent, that they shall operate retrospectively. Cooley's Con. Lim. 369; Sedgwick on Stat. and Cons. Law, 161. The statutes excluded from judicial favor, and subjected to this strictness of judicial construction—statutes which may be properly denominated retrospective, are such as take away or impair vested rights, acquired under existing laws, or create a new obligation, im-

[*Ex parte* Buckley.]

pose a new duty, or attach a new disability, in respect to transactions or considerations already past. *Society, &c.,* v. *Wheeler,* 2 Gall. 139. Such statutes are offensive to the principles of sound and just legislation, and it is of these the authorities to which we have been referred, use the term "odious," and other epithets expressive of judicial opprobium. There are other statutes which when operating retrospectively, have not incurred judicial condemnation, and to which a liberal construction for the consumation of the just and beneficent purposes in view, has been freely accorded. Such statutes are intended to remedy a mischief, promote public justice, correct innocent mistakes into which parties may have fallen, cure irregularities, or give effect to the acts and contracts of individuals fairly done and made. These are remedial statutes conducive alike to individuals and public good, 1 Kent. 456. To this class belongs statutes confirming marriages not celebrated according to law, confirmatory of contracts, offensive only to statutory prohibitions, remitting penalties, curing irregularities or defects in judicial proceedings, imparting validity to corporate acts or contracts, which were merely *ultra vires,* laws not adverse to, but in advancement of equitable principle. *Goshen* v. *Stonington,* 4 Conn. 221. In the very interesting and elaborate opinion of C. J. Hosmer, in this case, it is said: "I very much question, whether there is an existing government, in which laws of a retroactive nature and effect, impairing vested rights, but promotive of justice and the general good, have not been passed." The necessity of such laws is apparent, and perhaps the multitudinous authorities in which statutes have been assailed as retrospective, and the subject of discussion, may all be reconciled, upon the inquiry, whether they are in opposition to, or promote an equity existing against them—do they establish substantial justice, and subvert injustice.

This statute impairs no vested right, creates no new obligation, imposes no new duty, attaches no new disability, in respect to a past transaction, or arising out of a past consideration. It simply provides a remedy to secure the performance of a pre-existing duty. The officers nominated in it were under the obligation of executing an official bond with sufficient sureties. This duty is not enlarged—it remains as declared by existing law. Neither the penalty, condition, nor obligation of the bond, is altered. The sufficiency of the surety was not defined by existing law. Of that, the approving officer was the judge, without any fixed rule to regulate his discretion. This discretion the statute

regulates and controls by defining the qualifications the sureties must possess, qualifications just and reasonable, and by declaring disqualifications, which render the sufficency of the surety doubtful and uncertain. It cannot be seriously urged that a public officer has any vested right, under a statute imposing the duty of executing an official bond with sufficient surety, of furnishing sureties who are merely solvent, without regard to other considerations, which enter into the matter of sufficiency. Solvency is but one of the elements of sufficiency.

The whole field of operation of the statute is the future. If proceedings are not instituted under the statute, the officer remains in office, and the bond he has given, continues a security for the performance of duty. The grand jury, or any three members of the court of county commissioners, could pass on the sufficiency of his bond, and irrevocably adjudge it insufficient, on facts resting in their own knowledge, of which no notice is given him, and which he has not opportunity to contest. This statute merely provides an additional or cumulative remedy, for an inquiry into the sufficiency of official bonds—a remedy less capable of working injustice to the officer. Five or more freeholders, resident in the county, on an application stating cause, verified by affidavit, and by further affidavit, that there is no purpose to vex or harrass the officer, accompanied with bond to pay him such costs and damages as he may sustain, if the application is wrongful or vexatious, alone can invoke the remedy. Notice is given the officer, and he has the right and opportunity of contesting the facts. The statute is strictly remedial, promotive of public justice, and individual right and interest.

The proceedings contemplated by the statute are summary. Strict conformity to the statute, in the exercise of the jurisdiction it confers, is essential to the regularity and validity of the proceedings. It is an incident to the jurisdiction, to allow amendments which are necessary to conform the proceedings to the statute, and to continue the hearing as justice and right may demand. *Jemison* v. *P. & M. Bank*, 23 Ala. 168; *Murray* v. *Harper*, 3 Ala. 744; *Simmons* v. *Varnum*, 36 Ala. 92, *Evans* v. *State Bank*, 13 Ala. 787; *Caswell* v. *Ward*, 2 Doug. (Mich.) 374; *Polly* v. *S. & W. R. Co.* 9 Barb. 450. The chancellor did not therefore err, in the allowance of amendments, or in adjourning the hearing of the applications.

It is the established practice of this court not to reverse the judgment of a primary court, on a question of fact un-

[*Ex parte* Buckley.]

less it is manifestly wrong. *Dane* v. *Mayor of Mobile*, 36 Ala. 304; *Kirksey* v. *Kirksey*, 41 Ala. 626; *Kennedy* v. *Marrast*, 46, Ala. 161. We cannot declare the chancellor is in manifest error, if from the evidence disclosed in the bill of exceptions, he reached the conclusion, the residence of Stowe, the surety on Judge Buckley's bond, was not in this state. There are, however, undisputed facts, on which he could well be adjudged insufficient surety. There is certainly doubt as to his domicil. He is absent from this state during much of each year, not within the reach of, or amenable to the personal service of legal process. Prudent and conscientious men, in the uncertainty attending the fact of his residence, would hesitate to affirm on oath that it was without the State, to obtain process against his estate, incurring the peril of future litigation, in which facts might be shown as to his residence, they had not discovered. It is not contemplated that the citizen shall be subjected to any such embarrassments, in enforcing the liability of sureties on official bonds.

The statute is not obnoxious to the objection that its title is delusive, or does not clearly express the subject contained in its body. *Ex parte* Upshaw, 45 Ala. 234; *Ex parte* Pollard, 40 Ala. 77, Cooley's Cons. Lim. 141.

We do not find that any error or irregularity has been committed prejudicial to the petitioners. The grant of a *certiorari*, would result in the affirmance of the orders of the chancellor, and is of consequence unnecessary. The applications are therefore severally denied at the costs of the respective applicants.

On a former day of the term, we directed the clerk of the circuit court to suspend proceedings under the orders of the chancellor, until the further order of this court. An order will now be entered in each case, commanding the clerk of the circuit court of the county, if either one of the petitioners fails, before the 13th day of September next, to execute a new official bond, in obedience to the order of the chancellor, on that day to certify such failure to the governor.