857 So.2d 125 (2003)
Ex parte F.P. and R.P.
(In re F.P. and R.P. v. J.K.M. and S.L.M.).
1002146.
Supreme Court of Alabama.
March 21, 2003.
*126 Amardo Wesley Pitters, Montgomery, for petitioners.
John A. Nichols of Lightfoot & Nichols, Luverne, for respondents.
John A. Nichols of Lightfoot & Nichols. Luverne; Terry L. Butts of Cervera, Ralph & Butts, Troy; and Bryant A. Whitmire of Whitmire & Coleman, Birmingham, filed respondents' brief in support of application for rehearing.
William H. Pryor, Jr., atty. gen., and J. Coleman Campbell, deputy atty. gen., and James E. Long, asst. atty. gen., Department of Human Resources, filed brief of the attorney general defending the constitutionality of Alabama Act No. 2002-417.

On Application for Rehearing
PER CURIAM.
The opinion of February 22, 2002, is withdrawn, and the following is substituted therefor.[1]
F.P., the biological father ("the father"), and R.P., the paternal grandmother (sometimes hereinafter called "the grandmother"), appealed to the Court of Civil Appeals from a judgment entered by the trial court in favor of J.K.M. and S.L.M. ("the adoptive parents"). In its judgment, the court terminated the parental rights of the father to the minor child, denied the joint petition of the father and the grandmother *127 for custody of the child, and approved the adoption of the child by the adoptive parents. The court held that the father had abandoned the child and that, therefore, he had impliedly consented to the adoption of the child. The Court of Civil Appeals affirmed the judgment. F.P. v. J.K.M., 857 So.2d 110 (Ala.Civ.App.2001). We granted the father and the grandmother's petition for certiorari review. We reverse, render a judgment in part, and remand with instructions.
For a detailed account of the facts in this case, see the Court of Civil Appeals' opinion, 857 So.2d at 111-14. We summarize the pertinent facts as follows.
The biological parents of the minor child were both 17 years old when the child was born. The child is biracial. The biological parents attended high school in a small town, and the father said they could not date openly because of the racial difference. The mother testified that after she became pregnant, her mother told her she had to leave home. She said that after she became pregnant, she and the father "stopped having contact," but that she maintained contact with his mother, who drove her to several doctor's appointments. At one point after the baby was born, despite having consented to the child's adoption, the mother wrote a letter in which she stated that she wanted the paternal grandmother to have custody of the baby. She testified that she had been confused "since the first day" about what decision to make concerning the custody of the child.
The father testified that he was presently attending college and was working part-time. He said that he spends weekends at his mother's home. The father testified that if he obtains custody of the child, his mother would keep the child during the week while he is at school. The grandmother works, and several relatives and a neighbor testified that they were willing to provide child care during the week while the grandmother was working. The father said that he had never consented to the adoption; that the mother had told him she was pressured into consenting to the adoption because the child is biracial; and that he wants the child to be with his biological family.
The father has never seen the child. He and the grandmother tried to see the baby shortly after it was born, but were told they could not see the child without the mother's permission. He testified that he did not provide support for the mother during her pregnancy because, he says, she did not ask for it; he also testified that he has not provided any support to the adoptive parents because they have not requested it. He made one attempt to contact the adoptive parents by telephone before the hearing in this case, but he reached a relative of the adoptive parents who was babysitting; the relative told him he could not see the child. The adoptive parents say they are not sure they want to have any contact with the father because he is contesting the adoption and they say they would consider requests from him to see the child to be "harassing calls."
The child, a boy, was born on July 6, 1999. The adoptive parents took the child home from the hospital. The father petitioned the juvenile court on July 1, 1999, for a determination of a "father and child relationship." He stated in his petition that he thought the mother had given birth to a child on June 29, 1999, who he believed might be his biological child, that he had registered with the putative-father registry, and that he thought an adoption proceeding as to the child was pending in the probate court. He requested a blood test to determine paternity and a stay of any pending adoption proceedings.
*128 On July 12, 1999, the adoptive parents petitioned the probate court for adoption. Their petition alleged that the child was in the mother's custody and that "no other persons or agencies [had] any interest" in the child and that the mother was the only person known to them from whom consent was required. On July 13, the probate court entered an interlocutory order awarding custody of the child to the adoptive parents.
In December 1999, the father moved for a judicial determination adjudicating him the father, arguing that the results of a paternity test indicated a 99.99% probability that he was the child's father. On January 5, 2000, the court entered an order finding that F.P. was the father of the child, but on January 19, the court withdrew that order. On April 10, the father moved to dismiss the adoption proceedings in the probate court and to set aside the probate court's July 13 interlocutory order. Also on April 10, the father amended his petition for custody so as to seek joint custody of the child with the grandmother. On April 14, the adoptive parents moved to terminate the father's parental rights.
On April 20, the probate court transferred the adoption case to the juvenile court. After conducting a hearing, on September 20 the juvenile court entered an order finding that the father had "impliedly consented" to the adoption or had "relinquished" his claim to custody, terminating the father's parental rights, and granting the adoptive parents' adoption petition.
The father testified that he had another child by another girlfriend and that he provided financial and emotional support for that mother and child.
The Court of Civil Appeals affirmed the judgment, with two judges of that court holding:
"We conclude that the record demonstrates that F.P.'s conduct amounted to an abandonment of the child and that his conduct toward the child, both before and after its birth, contradicts the position he has taken in this legal proceeding. The record also demonstrates that F.P. had failed to offer any form of support for the child, and that he had failed to maintain any contact, or to seek visitation with, the child."
857 So.2d at 118. Presiding Judge Yates dissented, joined by Judge Crawley. In her dissent, Judge Yates concluded that the evidence in this case does not support findings that the father gave his implied consent to the adoption of the child, that his actions amounted to an abandonment of the child, or that the statutory criteria for terminating his parental rights were met.
After considering the record in this case, the main opinion of the Court of Civil Appeals, Presiding Judge Yates's dissent, and this Court's opinions in Ex parte C.V., 810 So.2d 700 (Ala.2001), and Ex parte Beasley, 564 So.2d 950 (Ala.1990), we agree with the views expressed by Judge Yates in her well-researched dissent. We quote Judge Yates's dissent below.
"I respectfully dissent from the main opinion affirming the trial court's judgment terminating the father's parental rights and approving the adoption of his minor child. The evidence does not support a finding that the father gave implied consent to the adoption or that his actions amounted to an abandonment of the child. To the contrary, the evidence supports a finding that the father has vigilantly pursued his legal rights to establish a relationship with the child and has sought legal and physical custody of the child. Further, on the basis of our supreme court's recent ruling in Ex *129 parte C.V., 810 So.2d 700 (Ala.2001) (reversing the trial court's judgment terminating a father's parental rights and approving an adoption based on implied consent), the evidence in this case, likewise, `does not tend to prove any of Alabama's applicable statutory criteria for terminating the father's parental rights.' 810 So.2d at 702.
"I am reciting the procedural history and the facts to present my rationale for disagreeing with the main opinion. On July 1, 1999, the father petitioned the juvenile court for a determination of `father and child relationship,' alleging that on or about June 29, 1999, `the mother' had given birth to a child he believed might be his biological child [the record indicates that the child was born on July 6, 1999]; that he had registered with the putative-father registry, § 26-10C-1, Ala.Code 1975; that he believed an adoption proceeding was pending in the Crenshaw County Probate Court; that he was requesting a blood test to determine paternity; and that he was requesting a stay of any pending adoption proceedings involving the minor child.
"On July 12, 1999, the adoptive parents petitioned the probate court for adoption, alleging that the child, born on July 6, 1999, was in the mother's custody and that `no other persons or agencies have any interest' in the child; that `all persons known to the [adoptive parents] at the time of filing this petition from whom consents or relinquishments to this adoption are required by law ... are as follows: [the mother]'; and that they were fit and proper persons to adopt the child. On July 13, 1999, the probate court entered an interlocutory judgment, awarding the adoptive parents custody of the child, ordering a postplacement investigation, and setting the case for a dispositional hearing in December 1999.
"In December 1999, F.P. moved for a judicial determination adjudicating him as the father, to allow him to pursue further legal action regarding the child. F.P. argued that a paternity test had indicated his probability of paternity at 99.99%. According to the case action summary, the court, on January 5, 2000, determined that, based on the result of the blood test, F.P. was the father of the child; however, on January 19, 2000, the court withdrew its order, stating, `[T]he order of January 5, 2000, is hereby set aside and a hearing is set for February 11, 2000, to determine paternity.'
"On April 10, 2000, the father moved the probate court to dismiss the adoption proceedings, to set aside the probate court's interlocutory order, and to order the adoptive parents to `immediately turn over custody of the minor child' to him. He argued that his paternity had been established pursuant to § 26-17-12, Ala.Code 1975; that he did not consent to the adoption pursuant to § 26-10A-7, Ala.Code 1975; that he had not been declared unfit and his parental rights had not been terminated; and that he was willing and able to care for the minor child. After the adoptive parents moved to transfer the adoption proceeding, the probate court, on April 20, 2000, entered an order transferring the adoption case to the juvenile court.
"On April 10, 2000, the father amended his petition for custody, seeking joint custody of the child with his mother. On April 14, 2000, the adoptive parents petitioned to terminate the father's parental rights, alleging that the mother had consented to the adoption, that the father was not a fit and proper person to have parental rights, and that it would be in the child's best interests to terminate the father's parental rights.

*130 "After conducting an ore tenus proceeding, the court, on September 8, 2000, entered an order finding that the father had `impliedly consented' to adoption or had `relinquished' his claim to custody, § 26-10A-2(4) and (13); terminating his parental rights, in reliance on § 26-10A-7, Ala.Code 1975; and granting the adoption of the minor child by the adoptive parents.
"The pertinent facts of this case are as follows: The minor child is biracial. The mother and father were both 17 years old and were attending high school in a small town at the time of the child's birth. The mother testified that after she became pregnant she was told to leave her mother's residence. She said that she thought the reason she was told to leave was because she had become pregnant by a person of another race. The mother and father testified that they had dated during high school; however, according to the father, they did not date openly because the mother's family did not approve. The mother testified that after she became pregnant she and the father `stopped having contact,' but that she maintained contact with his mother. Both the mother and the paternal grandmother stated that the paternal grandmother drove her to several doctor's visits for prenatal care, and the mother admitted that she had written a letter stating that she wanted the paternal grandmother to have custody of the child. She stated that she had been confused throughout the decisionmaking process and that she did not know what was the best decision for the child. When questioned by the court as to what she thought was in the best interest of her child, she stated that she thought the child would be `best off' with the adoptive parents because they were a two-parent household and could provide for the child financially.
"The father was attending college and working part-time at the time of the trial. He stated that he returned to his home on the weekends. He said that he had never seen his son. The paternal grandmother said that she (the grandmother), F.P., and the grandmother's daughter had attempted to visit the child when it was born and were told that they could not see the child without the mother's permission and were refused the visit. The father stated that he did not have any information on the adoptive parents other than a telephone number and that he had tried to reach them by telephone one week before the date of the trial. He said that he had never consented to the child's adoption and that the mother had stated that she had been pressured into consenting to an adoption because the child was biracial. He stated that he wanted the child to be with his natural family regardless of the child's race and that through his family's support he would be able to provide for the child while [the father] attended college. He stated that he had also fathered a child with his current 16-year-old girlfriend and that he was providing emotional and financial support to that mother and child. He said that he had never been convicted of any crimes; however, he admitted that he had been suspended from high school for `passing a marijuana cigarette' in the school bathroom.
"The father's witnesses included three siblings, who stated that they would assist him financially to support the child while he completed his college education; the paternal grandmother, who stated that she would care for the child in her home and wanted joint custody of the child; and two paternal aunts, who were retired, and who stated that they would provide child care. The judge *131 stated in open court that each of the witnesses was capable of providing for the child.
"The adoptive parents both testified as to the loving relationship they had developed with the child and their financial ability to provide for the child. The adoptive father stated that he felt any communication from the father requesting to see the child would be considered `harassing calls' and that he had not extended the same option to the father as to the mother to see the child, because the father was trying to prevent the adoption.
"Teresa Sanders, a Department of Human Resources (`DHR') caseworker, testified that the mother had told her about the father; however, she prepared the adoption documents without stating the father's name, because, according to her, the mother said she `didn't know his whereabouts.'
"Sandra Walker testified that she had known the mother `all of her life' and had known the father `all of his school career.' She stated that in addition to being an athletic trainer at the local high school, she also counseled teenage and unwed parents. She stated that she had advised the mother about placing the child for adoption and had facilitated the adoption. She stated that she did not consider the father or his family for an adoptive placement because she thought the father had rejected the mother and that he had denied being the father. She admitted that she did not discuss the pregnancy with the father and did not hear the father deny the child or say that he did not want the child.
"The assistant principal at the high school the mother and father had attended stated that he either observed or was told that the mother was pregnant, because it was common knowledge that they had been dating, and that he had discussed the mother's possible pregnancy with the father. He stated that the father said during their one conversation that `she wasn't pregnant' and that they did not discuss the issue again.
"The main opinion concludes that the father's conduct, both during the mother's pregnancy and after the child's birth, amounted to abandonment. The Alabama Adoption Code, § 26-10A-1 et seq., Ala.Code 1975, contains the following relevant provisions:
"`Section 26-10A-8. Consent or relinquishment by a minor parent.
"`. . . .
"`(c) A minor father may give his implied consent by his actions. If a court finds by conclusive evidence that a minor father has given implied consent to the adoption, notice and the appointment of a guardian ad litem shall not be necessary.'
"___________
"`Section 26-10A-9. Implied consent or relinquishment.
"`. . . .
"`(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.
"`(2) Leaving the adoptee without the provision for his or her identification for a period of 30 days.
"`(3) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months.
"`(4) Receiving notification of the pendency of the adoption proceedings *132 under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days.'
"The `prebirth-abandonment' provision contained in § 26-10A-9, Ala.Code 1975, and cited in the main opinion did not exist when the mother became pregnant; it became effective only on June 11, 1999, 25 days before the child's birth. I therefore question the applicability of the statute in this case. I agree that there may be instances in which a parent's actions prior to the birth of the child may be considered as evidence of his or her consent to an adoption; however, in this case, the father's conduct beginning immediately after the child's birth overwhelmingly negates any finding of an intent to abandon the child or to give implied consent to the adoption. I further agree with the special writings of several of the Justices in Ex parte C.V., supra, that any implied consent may be withdrawn by the subsequent actions of a parent. Chief Justice Moore states, in part:
"`A parent's conduct before the birth of the child can evince implied consent to an adoption. This was the case even before the 1999 amendment to § 26-10A-9 became effective on June 11, 1999. However, even if this Court were to assume that [the father] had impliedly consented to the adoption ..., § 26-10A-13, Ala.Code 1975, provides that an express consent can be withdrawn: [stating certain means for withdrawing it]. Express consent certainly communicates a clearer assent by a parent to an adoption than does implied consent. Logically, if a parent can withdraw express consent to an adoption, a parent can withdraw implied consent to an adoption.'
"C.V. at 702. Justice See's special concurrence states, in part:
"`It is clear that a parent can expressly consent to the adoption of his or her child before the child's birth, see Ala.Code 1975, §§ 26-10A-11(2), 26-10A-13(a) and (b). I see no reason a parent cannot also impliedly consent to a child's adoption before that child's birth. However, the Legislature has provided that, after the child's birth, a parent can withdraw his express prebirth consent to the child's adoption. See § 26-10A-13. If we are to recognize prebirth implied consent to adoption, then, I believe, consistent with the statutory structure for express consent and its withdrawal, we must also recognize implied withdrawal of prebirth consent.'
"C.V. at 705. As to the issue of abandonment, Justice Johnstone's special concurrence states, in part:
"`Abandonment, as defined by the Child Protection Act, is
"`"a voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
"`§ 26-18-3(1)(emphasis added [in Presiding Judge Yates's dissent]). This definition does not contemplate abandonment of an unborn child by a father, because a father cannot have custody of the unborn child. Simply put, § 26-18-7(a)(1) does not authorize a trial court to terminate parental rights for "prebirth abandonment" by a father. While the father's prebirth conduct towards the birth mother and *133 his alleged lack of financial support of the birth mother could be relevant to his fitness as a parent, the father's prebirth conduct toward the birth mother was not relevant to whether the father abandoned [the child].... A fortiori, I agree with several of my colleagues on this Court insofar as they observe in their special writings that the evidence in this case cannot support the conclusion that any abandonment by the father "continue[d] for a period of six months next preceding the [prospective adoptive parents'] filing of the petition" (§ 26-18-7(c) quoted above) so as to terminate the father's parental rights, as the Child Protection Act would require for the termination of the father's parental rights.'
"C.V. at 723-24.
"In S.W.B. v. R.C., 668 So.2d 835 (Ala.Civ.App.1995), this court approved an adoption of an infant, who was given to the adoptive parents by the biological mother and was subsequently reared by the couple for 12 years. We concluded in that case that the mother had failed to provide financial support, had not communicated with the child, and had failed to maintain a nominal parental relationship for the preceding seven years; therefore, the evidence supported `a finding of implied relinquishment' under § 26-10A-9, Ala.Code 1975, and we further held that the trial court's judgment terminating parental rights based on abandonment was due to be affirmed. Id. at 836-37. Our opinion stated, in part:
"`Under the Alabama Adoption Code, § 26-10A-1 et seq., Ala.Code 1975, consent or relinquishment of the adoptee is implied when the parents "knowingly [leave] the adoptee with others without provision for support and without communication," or when they "otherwise [do not maintain] a significant parental relationship with the adoptee for a period of six months." § 26-10A-9(2), Ala.Code 1975. In short, the statute provides that relinquishment is implied when parents have knowingly abandoned their child. "Abandonment" is defined in the Code as
"`"a voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
"`§ 26-18-3(1), Ala.Code 1975. A trial court can terminate parental rights if it finds by clear and convincing evidence that the parents have, among other things, abandoned their children. M.H.S. v. State Dep't of Human Res., 636 So.2d 419, 421 (Ala.Civ.App.1994); § 26-18-7, Ala.Code 1975.
"`. . . .
"`We could find no cases dealing with § 26-10A-9, Ala.Code 1975. However, the evidence in this case supports a finding of implied relinquishment of the child for adoption.... Therefore, we hold that, by implication, [the biological parents] relinquished [the child] for adoption; see § 26-10A-9, Ala.Code 1975. The trial court's judgment terminating the biological parents' parental rights and granting the adoption is due to be upheld. See, e.g., M.J.G.L. v. State Dep't of Human Res., 587 So.2d 1004 (Ala.Civ.App.1991).
*134 "`. . . .
"`... The Alabama Adoption Code, § 26-10A-1 et seq., [Ala.Code 1975], was adopted in 1990, replacing earlier law on the adoption of children, § 26-10-1 et seq., [Ala.Code 1975]. Because the Adoption Code is relatively new, there is little case law addressing its provisions. The Committee Comments to § 26-10A-9, dealing with implied consent of a parent for the adoption of his or her child, states:
"`"Just as acceptance of the terms of a commercial contract can be implied from the conduct of a party, so may the consent of a person to the adoption be implied from the conduct of that individual. When it is not possible to obtain the actual consent of a person who is specified in § 26-10A-7, this section enumerates instances in which a person's consent may be implied from his or her acts or omissions with respect to his or her duty to care for the adoptee in the past."'
"668 So.2d at 836-38.
"The main opinion discusses the father's failure to support the child and his failure to maintain contact or seek visitation with the child as a basis for terminating his parental rights. In this case, the trial court determined on January 5, 2000, that F.P. was the father; however, the trial court withdrew its order on January 19, 2000, and reset the case for a hearing to determine paternity. As in Ex parte C.V., it appears that the court established paternity for the father when it simultaneously terminated his parental rights. During testimony, the court commented on the father's ability to contribute to the child, stating, `I can understand when the man doesn't know where the child is that he can't send a gift or child support.' The only contact the father had with the adoptive parents was by a telephone call. I also question the father's obligation to support the child once the prospective adoptive parents received the child into their home, filed a petition for adoption, and petitioned to terminate the father's parental rights. Justice Johnstone's special writing [in Ex parte C.V.] stated, in part:
"`To penalize the father for failing to contribute to the prospective adoptive parents after they revealed themselves and [the child] but while they did their utmost to deny and to terminate the father's parental rights would be equally unfair.
"`Additionally, once prospective adoptive parents have received an adoptee into their home and have filed a petition for adoption, a court "shall [enter an interlocutory order] delegating to the [prospective adoptive parents] (1) custody, except custody shall be retained by ... the licensed child placing agency which held custody at the time of the placement until the entry of the final decree and (2) the responsibility of the care, maintenance, and support of the adoptee, including any necessary medical or surgical treatment, pending further order of the court." § 26-10A-18. Therefore, once the prospective adoptive parents petitioned to adopt [the child] they assumed responsibility for his care and support, and, thus, relieved the father of any duty of support.'
"810 So.2d at 722.
"In T.S. v. J.P., 674 So.2d 535 (Ala.Civ.App.1995), we held that in order to terminate parental rights in a pending adoption case, the court must determine whether grounds for termination exist, including, but not limited to, those specifically listed in the Child Protection *135 Act, § 26-18-1 et seq., Ala.Code 1975, and must also determine whether all viable alternatives to termination of parental rights have been considered. We stated, in part:
"`It follows, therefore, that Ala.Code 1975, § 26-10A-1 et seq., the Alabama Adoption Code (AAC) must be read in pari materia with Ala.Code 1975, § 26-18-1 et seq., the 1984 Child Protection Act (CPA).
"`. . . .
"`In the CPA, our legislature clearly provided guidelines and standards for terminating parental rights based upon clear and convincing evidence. [§ 26-18-7, Ala.Code 1975.] Mindful of the serious nature of cases involving the termination of parental rights and the need to comply with the requirements of due process, our Supreme Court established a two-pronged test be to applied. Ex parte Beasley, 564 So.2d 950 (Ala.1990). The court must determine whether grounds for termination exist, including, but not limited to, those specifically listed in § 26-18-7, and must also determine whether all viable alternatives to the termination of parental rights have been considered.... Furthermore, where the State or a nonparent seeks to terminate parental rights, the court must find that the child is dependent. Additionally, we note that the United States Supreme Court has held that, in a termination of parental rights proceeding, a "clear and convincing evidence" standard of proof satisfies the requirements of due process, while a lesser standard does not.
"`A construction of the AAC that usurps and overrides the CPA, and that calls for the application of a lesser or different standard, is an unworkable, unjust, and unreasonable interpretation. More importantly, the imposition of a lesser standard would clearly be unconstitutional.'
"Id. at 537 (citations omitted).
"The father stated that he worked part-time and would contribute to the financial support of the child while [the father] attended college. There was no testimony to indicate that he was unfit or unwilling to care for the child or that his circumstances would not change in the foreseeable future. He further stated that the mother had been pressured into the adoption because the child was biracial; that he wanted to rear the child within his family and the community, regardless of its mixed race, and that the child would live with his mother, so that he could continue his college education. I conclude that the father's conduct, including registering with the putative-father registry, promptly filing a petition for custody, and petitioning the court to stop the adoption proceedings, indicates a willingness and desire to rear the child.
"Last, the evidence does not support a finding that there are no viable alternatives to terminating his parental rights. There was ample testimony indicating that the paternal grandmother was a suitable relative resource to be considered as an alternative placement for the child. The trial court stated that the paternal grandmother was capable of caring for the child, and it made the same assessment of several other paternal relatives who testified."
857 So.2d at 118-25 (footnote omitted).
We adopt the above-quoted portion of Presiding Judge Yates's dissent as this Court's opinion, except insofar as her dissent would recognize the possibility of prebirth abandonment before § 26-10A-9, *136 Ala.Code 1975, was amended to provide specifically for prebirth abandonment.
On rehearing, the adoptive parents ask us to consider amendments to the Alabama Adoption Code, § 26-10A-1 et seq., Ala.Code 1975, passed by the Legislature effective April 17, 2002. See Act No. 2002-417, Ala. Acts 2002. Section 1 of Act 2002-417 amended § 26-10A-9 to provide:
"(a) A consent or relinquishment required by Section 26-10A-7 may be implied by any of the following acts of a parent:
"(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.
"(2) Leaving the adoptee without provision for his or her identification for a period of 30 days.
"(3) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months.
"(4) Receiving notification of the pendency of the adoption proceedings under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days.
"(5) Failing to comply with Section 26-10C-1 [the putative-father registry].
"(b) Implied consent under subsection (a) may not be withdrawn by any person."
Section 2 of Act No. 2002-417 states: "This act shall have retroactive effect to January 1, 1997."
On rehearing, the biological father challenges the constitutionality of those amendments to § 26-10A-9 in Section 1 of Act No. 2002-417 and the retroactivity provision in Section 2. He has complied with § 6-6-227, Ala.Code 1975, in notifying the attorney general of his constitutional challenge. The attorney general has elected to participate in this case, and has filed a supplemental brief addressing the constitutionality of Act No. 2002-417, as did the parties.
The first amendment to § 26-10A-9(a)(1) that recognized the concept of prebirth abandonment became effective on June 11, 1999, approximately 25 days before the birth of the child. The amendment defined abandonment to include the father's failure, if he knew of the pregnancy, to provide financial and/or emotional support for six months before the birth. Only 25 days of the 6 month period the amended statute recognized as constituting prebirth abandonment had run as of the date of the birth of the child. We conclude that the prebirth-abandonment provision cannot apply to this case unless that portion of Act No. 2002-417 giving retroactive effect to January 1, 1997, to the amended statutes requires otherwise.
Considering first the statute as amended effective June 11, 1999, i.e., before the enactment of the retroactive provision of Act No. 2002-417, we note that retrospective application of a statute is generally not favored, absent an express statutory provision or clear legislative intent. Ex parte Clayton, 552 So.2d 152 (Ala.1989); Dennis v. Pendley, 518 So.2d 688 (Ala.1987); Jones v. Casey, 445 So.2d 873 (Ala.1983). As this Court stated in City of Brewton v. White's Auto Store, Inc., 362 So.2d 226 (Ala.1978):
"Courts indulge every presumption in favor of construing actions of the legislature to have a prospective operation unless the legislature's intention is otherwise stated in express terms, or clearly, *137 explicitly, and unmistakenly permit of no other meaning. The rule was stated in Ex parte Buckley, 53 Ala. 42, 54-55 (1875), as follows:
"`... Retrospective statutes, when within legislative competency, are not favored, and it is a sound rule of judicial construction, that they shall operate prospectively only, unless the terms show a clear legislative intent, that they shall operate retrospectively. The statutes excluded from judicial favor, and subjected to this strictness of judicial constructionstatutes which may be properly denominated retrospective, are such as take away or impair vested rights, acquired under existing laws, or create a new obligation, impose a new duty, or attach a new disability, in respect to transactions or considerations already past.'"
362 So.2d at 227 (citations omitted).
To hold that the father fulfilled the requirement for a 6-month prebirth abandonment pursuant to a statute that became effective only 25 days before the birth of the child would "create a new obligation, impose a new duty, or attach a new disability, in respect to [a] transaction[] ... already past." Ex parte Buckley, 53 Ala. 42, 55 (1875). In that respect, the statute as amended in 1999 is properly subject to a strict rule of construction. In the absence of an express statement for retroactive application, we give the 1999 amendment prospective effect only.
With the passage of Act No. 2002-417, however, the Legislature expressly made all of § 26-10A-9, as amended, including both the prebirth-abandonment provision and the provision making implied consent irrevocable, retroactive to January 1, 1997. An act that is expressly retroactive will be given retroactive effect unless it impairs vested rights. Alabama Alcoholic Beverage Control Bd. v. City of Pelham, 855 So.2d 1070 (Ala.2003). Section 95 of Art. IV of the Alabama Constitution of 1901 provides: "After suit has been commenced on any cause of action, the Legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit." The question before us on rehearing, then, is whether the provisions of Act No. 2002-417 can apply to the father or whether his rights had vested before its enactment. See Ex parte Alfa Fin. Corp., 762 So.2d 850, 852 (Ala.1999) (because the plaintiffs had sued on a viable cause of action before the Legislature enacted an amendment to Alabama's "Mini-Code" that prohibited a private cause of action, the amendment could not be applied to prohibit the plaintiffs' existing action without violating Art. IV, § 95, Ala. Const. of 1901).
The father filed what he called a "petition to determine father and child relationship" on July 1, 1999, before the child was born. In that document, he alleged that he had registered with the putative-father registry maintained by the Department of Human Resources. See § 26-10C-1, Ala.Code 1975. By registering his notice of intent to claim paternity with the putative-father registry, the father was entitled to notice of, and the opportunity to contest, the adoption proceeding. See § 26-10C-1(f) and (i). The father filed a motion for a paternity test on July 12. Also on July 12, in a separate proceeding, the adoptive parents filed their petition for adoption, which stated that the mother was the only person "known to the petitioners at the time of filing this petition from whom consents or relinquishments to this adoption are required by law." Because the father was not listed in the adoption petition, he did not officially receive notice of the adoption at that time. However, he continued to pursue the paternity action he *138 began on July 1, filing a motion for judicial determination of paternity on December 1 after receiving the results of the paternity test and a petition for custody of the child on April 10, 2000. On that same day, he appeared in the adoption proceeding begun by the adoptive parents, filing a motion to set aside the adoption. The two actions were later consolidated.
By filing with the putative-father registry, the father clearly had a defense to the adoption action filed by the adoptive parents. He also had filed his own action to establish paternity. Therefore, the Legislature was prohibited by Art. IV, § 95, Ala. Const. of 1901, from taking away his rights by enacting Act No. 2002-417. Because the father's rights had vested before the passage of Act No. 2002-417 and that Act cannot be applied retroactively as to him, we do not address the arguments concerning the constitutionality of the substantive provisions of the Act in proceedings where § 95 is not at issue; we leave those questions for another day.
Finally, we address the contention that the father abandoned the child after its birth. Postbirth, the father had a justifiable excuse for failing to establish a relationship with the childthe adoptive parents did not wish to allow him to do so. The definition of abandonment in § 26-18-3(1), a part of the Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, which we read in pari materia with § 26-10A-9(3), a part of the Adoption Code, recognizes excuse as a basis on which to avoid abandonment. We hold that the father did not abandon the child, either before or after its birth; therefore, he did not impliedly consent to the child's adoption.
We conclude that the trial court erred in terminating the father's parental rights and in awarding custody of the child to the adoptive parents, and that the Court of Civil Appeals erred in affirming the judgment of the trial court. We reverse the judgment of the Court of Civil Appeals. Because the evidence in this case does not tend to prove any of Alabama's applicable statutory criteria for terminating the father's parental rights, we render a judgment for F.P. insofar as his parental rights as the father of the child are not terminated, and we remand this cause directly to the Crenshaw Juvenile Court for proceedings to determine the proper custody of the child.
APPLICATION OVERRULED; OPINION OF FEBRUARY 22, 2002, WITHDRAWN; OPINION SUBSTITUTED; REVERSED; JUDGMENT RENDERED IN PART; AND REMANDED WITH INSTRUCTIONS.
HOUSTON, LYONS, JOHNSTONE, and HARWOOD, JJ., concur.
SEE, J., concurs specially.
MOORE, C.J., concurs in the result.
BROWN, WOODALL, and STUART, JJ., dissent.
SEE, Justice (concurring specially).
I concur in the main opinion's holding that Act No. 2002-417 cannot be applied retroactively to the father in this case because his rights had vested before the passage of the Act. I also concur with the main opinion's holding that the father did not abandon his child before or after the child's birth; therefore, he had not impliedly consented to the adoption of the child. However, I concur specially because the main opinion "adopt[s] the above-quoted portion of Presiding Judge Yates's dissent as this Court's opinion, except insofar as her dissent would recognize the possibility of prebirth abandonment before § 26-10A-9, Ala.Code 1975, was amended to provide specifically for prebirth abandonment." 857 So.2d at 135-36. I agree with *139 Judge Yates thatprior to the amendment of the statutea parent could both impliedly consent to a child's adoption before that child's birth and impliedly withdraw that implied prebirth consent to the adoption. Id. Therefore, I agree with Judge Yate's statement in her dissenting opinion that "there may be instances in which a parent's actions prior to the birth of the child may be considered as evidence of his or her consent to an adoption; however, in this case, the father's conduct beginning immediately after the child's birth overwhelmingly negates any finding of an intent to abandon the child or to give implied consent to the adoption." F.P. v. J.K.M., 857 So.2d 110, 121 (Ala.Civ.App.2001) (Yates, P.J., dissenting).
The Legislature amended portions of the Adoption Code, including § 26-10A-9, effective April 17, 2002, to provide that implied consent "may not be withdrawn by any person." Act No. 2002-417, Ala. Acts 2002. Thus, I note that the part of my special concurrence in Ex parte C.V., 810 So.2d 700, 703 (Ala.2001), stating that implied consent may be withdrawn has been overruled by legislative amendment.
STUART, Justice (dissenting).
I respectfully dissent. The trial court, following a proceeding at which evidence was presented ore tenus, granted the adoptive parents' petition for adoption on two alternative grounds: that the father, F.P., had "impliedly consented" to adoption or that he had "relinquished" his claim to custody. The trial court terminated the father's parental rights and granted the adoption petition. Adoption is a purely statutory proceeding, and the adoption statutes must be strictly construed. The Legislature has defined what constitutes "implied consent" to an adoption and has specifically provided that abandonment "includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth." § 26-10A-9(a)(1), Ala.Code 1975. When this Court issued its original opinion in this case, the Legislature had made no provision for the withdrawal of an "implied consent." I did not believe it was the prerogative of this Court to write into the Adoption Code a provision the Legislature chose to omit. Since that date, the Legislature has amended § 26-10A-9 to provide specifically that "[i]mplied consent ... may not be withdrawn."
While I believe the trial court correctly decided the issue whether F.P. gave his implied consent, I write to address other errors in the main opinion. I feel inspired, indeed compelled, to do so because of Justice Maddox's special concurrence in Ex parte Beasley, 564 So.2d 950, 958 (1990), one of the very cases cited as authority in the main opinion, in which he explained why he was writing as follows: "[B]ecause dictum sometimes has a habit of growing full-blown into precedent, I felt compelled to express my views on the matter, in the hope that the rule of law will be corrected before it becomes entrenched."[2] I will return to the merits of Justice Maddox's writing later in this dissent.
This case was decided by the trial court following the presentation of ore tenus evidence. The ore tenus rule requires that an appellate court give special credence to the factual determinations of a trial court in a case in which evidence is presented ore tenus and that it reverse the trial court's judgment in such a case only where *140 the trial court's decision is not supported by the evidence and is clearly and palpably wrong. That is not the case here.
The record in this case more than amply supports the trial court's finding that F.P. abandoned the child, thereby impliedly consenting to his adoption; it further supports an order terminating F.P.'s parental rights. Significant facts found in the record are omitted from the dissenting opinion of Presiding Judge Yates, which the per curiam opinion adopts in part as the opinion in this cause. At best, Presiding Judge Yates's dissent minimizes F.P.'s misconduct and portrays his actions in a most favorable light. The record can easily be read in a different light and when it is it completely supports the trial court's ruling, thereby entitling its judgment to an affirmance. The dissent states:
"The mother testified that after she became pregnant she and the father `stopped having contact,' but that she maintained contact with his mother. Both the mother and the paternal grandmother stated that the paternal grandmother drove her to several doctor's visits for prenatal care, and the mother admitted that she had written a letter stating that she wanted the paternal grandmother to have custody of the child."
857 So.2d at 119. The record reflects that F.P. stopped having contact with the mother in October 1998 after she told him she was pregnant. In fact, he shunned her. They went to the same school, but he ignored her. When an assistant principal/coach at the school confronted him about the mother's pregnancy and about assuming responsibility for his child, he not only denied he was the fatherhe denied the mother was pregnant. The record indicates that F.P.'s mother drove the mother to two doctor's appointments at the mother's request. Rather than being confused about whether to place her child for adoption and give her consent to an adoption, the mother attended a meeting in the witness room at the Crenshaw County courthouse with an adoption counselor before the birth of the child. Present at this meeting with the natural mother and the counselor were the mother's mother, the mother's attorney, F.P., F.P.'s mother, F.P.'s brother, and F.P.'s attorney. After this meeting, at which F.P. expressed no opposition to the adoption, the mother gave her written consent to the adoption. The letter the mother wrote indicating that she wanted F.P.'s mother to have custody of the child was not written until March 20, 2000. In fact, F.P.'s mother requested the letter and told the young mother what to say. At the time of trial the mother was very clear that she wanted the adoption to proceed and that she thought having her child remain with the adoptive parents was in the child's best interest.
The main opinion, quoting Presiding Judge Yates's dissent, states:
"[The father] said that he had never seen his son. The paternal grandmother said that she (the grandmother), F.P., and the grandmother's daughter had attempted to visit the child when it was born and were told that they could not see the child without the mother's permission and were refused the visit. The father stated that he did not have any information on the adoptive parents other than a telephone number and that he had tried to reach them by telephone one week before the date of the trial. He said that he had never consented to the child's adoption and that the mother had stated that she had been pressured into consenting to an adoption because the child was biracial. He stated that he wanted the child to be with his natural family regardless of the child's race *141 and that through his family's support he would be able to provide for the child while [the father] attended college. He stated that he had also fathered a child with his current 16-year-old girlfriend and that he was providing emotional and financial support to that mother and child. He said that he had never been convicted of any crimes; however, he admitted that had been suspended from high school for `passing a marijuana cigarette' in the school bathroom."
857 So.2d at 130.
The record reflects that F.P. tried to visit the child one time at the hospital. He was told the child had been returned to the nursery and that he could not see the baby at that time; he was never told that he could never see the child. He did not try to see the child or even to talk to the mother for three weeks after his attempted visit at the hospital. When he did have contact, he learned that the child was no longer with the mother. F.P. did not attempt to contact his child until the Saturday before the trial of this case on April 28, 2000 (10 months after the child's birth). The adoptive grandmother, who was baby-sitting the child, answered the telephone when F.P. called; she told F.P. that the adoptive mother, whom he asked to speak with, was not home. F.P. did not call back. He made no other efforts to contact the adoptive parents or the child.
F.P. provided no emotional support to the mother; he provided no financial support to the mother or the child before or after its birth. He paid no birth expenses for the child. The main opinion, again quoting Presiding Judge Yates's dissent, states: "He stated that he had also fathered a child with his current 16-year-old girlfriend and that he was providing emotional and financial support to that mother and child." 857 So.2d at 130. The record indicates that this 16-year-old young woman was still his girlfriend at the time this appeal was filed and that he has provided less than $50 in financial support to her, the mother of his second child. His reason for failing to provide more financial support was that the young woman never asked for it.
The main opinion states that F.P. was suspended from school because he had passed around a marijuana cigarette in the school bathroom. The record indicates, however, that F.P. testified that he was passing some drugs for a friend but that no money was involved. He stated that he was suspended from school for that episode, but he also testified that he was expelled from high school during his senior year.
The main opinion, quoting Presiding Judge Yates's dissent, states:
"The father's witnesses included three siblings, who stated that they would assist him financially to support the child while he completed his college education; the paternal grandmother, who stated that she would care for the child in her home and wanted joint custody of the child; and two paternal aunts, who were retired, and who stated that they would provide child care. The judge stated in open court that each of the witnesses was capable of providing for the child."
857 So.2d at 130-31.
F.P. originally sought custody for himself. Only on April 19, 2000, did he amend his petition to seek joint custody with his mother. A significant question is what F.P. actually proposes as living arrangements for his son. He proposes to have his son reside with his mother in her hometwo hours from where he lives. The child will be cared for by relatives while his mother works. His mother and his older siblings will financially support the minor child. F.P. will go on with his *142 life, continuing with junior college and his part-time job. He states he will come home on weekends to visit his son. F.P. is not actually seeking custody for himself or assuming any of the responsibilities of parenthood; he is merely claiming the right of visitation with his child. "An individual granted legal custody shall exercise the rights and responsibilities personally unless otherwise authorized by the juvenile court." § 12-15-1(17), Ala.Code 1975. The trial court properly rejected this proposal of "parenthood by others," in which the natural parent plays a minor role, as being contrary to the best interest of the child.
Presiding Judge Yates's opinion, adopted in all pertinent respects by the per curiam opinion of this Court, in condemning the majority opinion of the Court of Civil Appeals, states:
"The main opinion discusses the father's failure to support the child and his failure to maintain contact or seek visitation with the child as a basis for terminating his parental rights. In this case, the trial court determined on January 5, 2000, that F.P. was the father; however, the trial court withdrew its order on January 19, 2000, and reset the case for a hearing to determine paternity. As in Ex parte C.V., [810 So.2d 700 (Ala.2001)] it appears that the court established paternity for the father when it simultaneously terminated his parental rights. During testimony, the court commented on the father's ability to contribute to the child, stating, `I can understand when the man doesn't know where the child is that he can't send a gift or child support.' The only contact the father had with the adoptive parents was by a telephone call. I also question the father's obligation to support the child once the prospective adoptive parents received the child into their home, filed a petition for adoption, and petitioned to terminate the father's parental rights. Justice Johnstone's special writing [in Ex parte C.V.] stated, in part:
"`To penalize the father for failing to contribute to the prospective adoptive parents after they revealed themselves and [the child] but while they did their utmost to deny and to terminate the father's parental rights would be equally unfair.
"`Additionally, once prospective adoptive parents have received an adoptee into their home and have filed a petition for adoption, a court "shall [enter an interlocutory order] delegating to the [prospective adoptive parents] (1) custody, except custody shall be retained by ... the licensed child placing agency which held custody at the time of the placement until the entry of the final decree and (2) the responsibility of the care, maintenance, and support of the adoptee, including any necessary medical or surgical treatment, pending further order of the court." § 26-10A-18. Therefore, once the prospective adoptive parents petitioned to adopt [the child] they assumed responsibility for his care and support, and, thus, relieved the father of any duty of support.'"
857 So.2d at 123-24.
The facts of the present case and Ex parte C.V., 810 So.2d 700 (Ala.2001), should not be confused, nor should dicta in a specially concurring opinion be deemed to be the law of this State. The adoptive parents in this case did not petition to terminate F.P.'s rights until April 14, 2000. In doing so they relied upon the provisions of the Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, regarding the termination of parental rights. The above-quoted recitation by Presiding Judge Yates of Justice Johnstone's special writing in Ex *143 parte C.V. serves to perpetuate erroneous declarations of the law of this State.
Although I believe it was also true before the amendment, clearly the amendment of § 26-10A-9, Ala.Code 1975, requiring a putative father to support his child before the child's birth dispels any previously held notion that a putative father has no obligation to support his child until his paternity is established and he is placed under a court order to pay child support. This portion of the opinion further erroneously asserts that the father has no obligation to support his child or to visit his child after the entry of the preliminary custody order in an adoption proceeding and before the entry of an order terminating his parental rights. Alabama law is clearly to the contrary. Legal custody is defined by § 12-15-1(17), Ala.Code 1975, as:
"A legal status created by court order which vests in a custodian the right to have physical custody of the child and to determine where and with whom the child shall live within the state and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, clothing, education, and ordinary medical care, all subject to the powers, rights, duties, and responsibilities of the guardian of the person of the child and subject to any residual parental rights and responsibilities. An individual granted custody shall exercise the rights and responsibilities personally unless otherwise authorized by the juvenile court."
(Emphasis added.)
Further evidence of this requirement are the statutory provisions of the Alabama Adoption Code, § 26-10A-1 et seq., Ala.Code 1975, and the Child Protection Act. The Alabama Adoption Code states: "A consent or relinquishment required by Section 26-10A-7 may be implied by any of the following acts of a parent: ... (3) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months." § 26-10A-9, Ala.Code 1975. (Emphasis added.) The Adoption Code defines "adoptee" as: "[t]he person being adopted." § 26-10A-2(2), Ala.Code 1975. The Child Protection Act sets forth the factors a court should consider in determining whether to terminate parental rights. In addition to the factors that may be considered in all termination-of-parental-rights cases, subsection (b) of § 26-18-7, Ala.Code 1975, provides:
"Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
". . . .
"(3) Failure by the parents to maintain consistent contact or communication with the child.
". . . ."
The main opinion, adopting Presiding Judge Yates's dissent, continues:
"In T.S. v. J.P., 674 So.2d 535 (Ala.Civ.App.1995), we held that in order to terminate parental rights in a pending adoption case, the court must determine whether grounds for termination exist, including, but not limited to, those specifically listed in the Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, and must also determine whether all viable alternatives to termination of parental rights have been considered...." *144 857 So.2d at 134-35. The main opinion then quotes Ex parte Beasley. In Beasley Justice Maddox, in a special concurrence, wrote:
"I concur in the result reached, but I disagree with that portion of the opinion that states that there must be a `finding of dependency' when the State or a nonparent is the petitioner. The Uniform Child Protection Act of 1984 makes no such requirement, and the cases of this Court and the Court of Civil Appeals that construe the Child Protection Act to make such a requirement are clearly wrong and should be overruled.
". . . .
"The Uniform Child Protection Act of 1984, in my opinion, changed that procedure. It is a comprehensive act that now provides for the procedure and the substantive grounds that must be proved in a termination of parental rights case, such as: (1) the person or entities who may file a petition (Ala.Code 1975, § 26-18-5), (2) the procedure to be used for consideration of such petitions, and (3) the grounds that must be alleged and proved."
564 So.2d at 955-56. Justice Maddox correctly pointed out that the requirement that there be a "finding of dependency" is not found in the statute. He noted: "The majority finds this requirement outside the statute and engrafts it onto the statute." 564 So.2d at 957.
Although Justice Maddox did not discuss it in his writing in Beasley, the same analysis applies to the so-called second prong of the test in termination-of-parental-rights cases, i.e., whether "all viable alternatives to termination have been considered." This requirement is not contained in the Child Protection Act nor in any statutory provision of Alabama law. Just where does this language, "consideration of all viable alternatives to termination," originate? It appeared originally in childabuse and neglect cases involving the Department of Human Resources. Some early cases state that parties pursuing this argument cited an unusual federal case, Roe v. Conn, 417 F.Supp. 769 (M.D.Ala.1976), as authority. Alabama courts have stated that they will not be bound by the criteria set forth in Roe, but have stated that "[t]he trial court, in determining the best interests of the children, looks at several factors. Less drastic measures than permanent removal of custody from the mother is such a factor the trial court should consider." Lovell v. Department of Pensions & Sec., 356 So.2d 188, 190 (Ala.Civ.App.1978). The Lovell court continued: "[t]he trial courts of Alabama, in determining the best interest of children, should look to viable alternatives before terminating parental rights." Id. Over the years the phrase was repeated, omitting the phrase "in determining the best interest of the children." It was changed from one of several criteria to be considered to the second prong of a two-pronged test and, again without analysis, it was applied to termination-of-parental-rights cases not involving the State or the Department of Human Resources. While such a factor might be a consideration where the Department of Human Resources has removed a child from the custody of its parents, that same argument does not apply equally in the case of the adoption of an infant. Furthermore, it is simply not part of the statutory scheme adopted by the Legislature in the Child Protection Act; its continuation is by judicial engraftment only and is wrong.
As the main opinion notes, since this Court issued its original opinion in this case, the Legislature has amended the Alabama Adoption Code; those amendments were effective April 17, 2002. See Act No. 2002-417, Ala. Acts 2002. The amendments *145 clarified the original intent of the Legislature and corrected this Court's misinterpretation of the statutes expressed in the original opinion issued in this case. The Legislature expressly made all of the Act, including the amendment to § 26-10A-9, which include both the prebirth-abandonment provision and the provision making implied consent irrevocable, retroactive to January 1, 1997. The majority refuses to apply Act No. 2002-417 retroactively in this case, holding that the father had a vested right before the amendment became effective. I believe the majority errs; however, as I have stated I believe the trial court properly found that F.P. gave his implied consent to adoption and properly terminated F.P.'s parental rights under the law as it existed prior to the recent amendments.
The main opinion, lastly, states:
"Finally, we address the contention that the father abandoned the child after its birth. Postbirth, the father had a justifiable excuse for failing to establish a relationship with the childthe adoptive parents did not wish to allow him to do so. The definition of abandonment in § 26-18-3(1), a part of the Child Protection Act, § 26-18-1 et seq., Ala.Code 1975, which we read in pari materia with § 26-10A-9(3), a part of the Adoption Code, recognizes excuse as a basis on which to avoid abandonment. We hold that the father did not abandon the child, either before or after its birth; therefore, he did not impliedly consent to the child's adoption."
857 So.2d at 138. Act No. 2002-417 provides:
"§ 26-10A-18.
"Once a petitioner has received the adoptee into his or her home for the purposes of adoption and a petition for adoption has been filed, an interlocutory decree shall be entered delegating to the petitioner (1) custody, except custody shall be retained by the Department of Human Resources or the licensed child placing agency which held custody at the time of the placement until the entry of the final decree and (2) the responsibility for the care, maintenance, and support of the adoptee, including any necessary medical or surgical treatment, pending further order of the court. This interlocutory decree shall not stop the running of time periods prescribed in Section 26-10A-9."
Section 26-10A-9 provides:
"(a) A consent or relinquishment required by Section 26-10A-7 may be implied by any of the following acts of a parent:
"(1) Abandonment of the adoptee. Abandonment includes, but is not limited to, the failure of the father, with reasonable knowledge of the pregnancy, to offer financial and/or emotional support for a period of six months prior to the birth.
"(2) Leaving the adoptee without provision for his or her identification for a period of 30 days.
"(3) Knowingly leaving the adoptee with others without provision for support and without communication, or not otherwise maintaining a significant parental relationship with the adoptee for a period of six months.
"(4) Receiving notification of the pendency of the adoption proceedings under Section 26-10A-17 and failing to answer or otherwise respond to the petition within 30 days.
"(5) Failing to comply with Section 26-10C-1.
"(b) Implied consent under subsection (a) may not be withdrawn by any person."
Even applying Act No. 2002-417 prospectively only, this Court has no authority to *146 find F.P.'s failure to pay support and to maintain communication or to otherwise maintain a significant parental relationship with the adoptee following his birth excused.
The trial court's order is supported by clear and convincing evidence; the decision of the Court of Civil Appeals should be affirmed. The reversal of the judgment of the Court of Civil Appeals by the majority necessitates a remand of this case to the trial court, which will now be required to consider to whom custody of the minor child should be awarded and what visitation should be ordered. If appropriate, the award of child support, retroactive child support, and the payment of the child's birth and medical expenses must also be addressed. The "best interest of the child" standard will be applicable. See § 26-10A-24, Ala.Code 1975. The trial court must consider F.P.'s prebirth and postbirth conduct as well as the minor child's present situation.
NOTES
[1] On February 22, 2002, we released an opinion in which we reversed the judgment of the Court of Civil Appeals. The adoptive parents filed an application for rehearing, then requested that we allow the parties time for mediation in an attempt to settle this case. We allowed the mediation, but it was not successful. We then had the parties resume their briefing schedule on rehearing. After those briefs were filed, we requested additional briefs from the parties addressing specific questions. After considering all of the materials filed by the parties on rehearing, we now withdraw our original opinion and substitute today's decision.
[2] Justice Maddox quotes Justice Jones, writing for the majority in Lorence v. Hospital Board of Morgan County, 294 Ala. 614, 320 So.2d 631 (1975), who recited the "Primeval Calf" by Sam Walter Foss. 564 So.2d at 958 n. 7.